Filed 10/30/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COMMUNITY YOUTH ATHLETIC CENTER, | D060001, D061141 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2007-00076404-CU-EI-CTL) |
| CITY OF NATIONAL CITY et al., | |
| Defendants and Appellants, | |
| ROBERT LEIF et al., | |
| Defendants and Respondents. | |
| . | |

APPEAL from a judgment of the Superior Court of San Diego County, Steven R. Denton, Judge. Affirmed in part, reversed in part with directions.

Pillsbury Winthrop Shaw Pittman, Richard M. Segal, Brian D. Martin, Nathaniel R. Smith; Institute for Justice, Dana Berliner and Jeff Rowes, for Plaintiff and Appellant.

Claudia G. Silva, City Attorney; Best Best & Krieger, Bruce W. Beach, Rebecca J. Andrews and Ellen P. Head, for Defendants and Appellants.

Thorsnes Bartolotta McGuire, Vincent J. Bartolotta, Jr. and Karen R. Frostrom, for Defendants and Respondents.

In 2007, defendants and appellants, the City of National City and its Community Development Commission (the Commission or CDC; together, the City), approved an amendment to its 1995 redevelopment plan, ordinance No. 2007-2295 (Amendment), that extended the time period authorized by the plan for the use of eminent domain powers within a 300-acre area, based on certain designations of physical and economic blight. (Health & Saf. Code, § 33000 et seq., the Community Redevelopment Law (CRL); all further statutory references are to the Health & Safety Code unless noted.)  During the City's months-long amendment and hearing process, it received statutorily mandated reports from a retained private consultant, held noticed hearings, and received opposition from two sets of landowners within the Amendment area, plaintiff and appellant Community Youth Athletic Center (CYAC), and additional respondents, Robert Leif, Suzanne Leif and Anthony Bedford (the "Interested Parties").  (§§ 33352, subd. (b); 33457.1.)[1]

---

[1]     Under section 33352, subdivision (b):  "Every redevelopment plan submitted by the agency to the legislative body shall be accompanied by a report containing all of the following:  [¶] (b) A description of the physical and economic conditions specified in Section 33031 that exist in the area that cause the project area to be blighted. *The description shall include a list of the physical and economic conditions described in Section 33031 that exist within the project area and a map showing where in the project the conditions exist*.  The description shall contain *specific, quantifiable evidence* that documents both of the following:  [¶] (1) The physical and economic conditions specified in Section 33031.  [¶] (2) That the described physical and economic conditions are so *prevalent and substantial* that, collectively, they seriously harm the entire project area."  (Italics added.)

2

When their opposition to the City's approval of the Amendment was unsuccessful, CYAC brought this reverse validation action in superior court (Code Civ. Proc., § 860 et seq., the Validation Act), to seek declaratory and injunctive relief and damages under several statutory and constitutional theories, along with attorney fees and costs. (CRL, §§ 33500, 33501; Gov. Code, § 6250 et seq., Public Records Act (PRA) violations; U.S. Const., 14th Amend. (due process clause); 42 U.S.C. § 1988.) The response filed by the Interested Parties sought similar relief.

After a bench trial, the superior court issued a statement of decision and judgment in favor of CYAC, the Interested Parties and the interested public. In the reverse validation proceedings, the trial court examined the administrative record and set aside the Amendment to the redevelopment plan, by issuing declaratory relief based on its findings of several violations of the CRL: (1) contrary to the provisions of section 33457.1, the City failed to include in its mandated report, *prior to the hearing on such Amendment*, the maps required by section 33352, subdivision (b) that documented the physical and economic conditions of blight that existed within the project area, (2) the administrative record did not contain substantial evidence supporting the physical blight findings underlying the Amendment, and (3) neither the City nor its retained private consultant (Rosenow Spevacek Group, or "RSG") had produced, on request by CYAC, two types of underlying raw data relied upon in the RSG "Report to Council" (the "RTC") (i.e., RSG's field surveys of blight conditions, or the City's police department's

3

property-by-property crime data).[2]  The City had relied on those RSG field surveys and crime data to support the enactment of the Amendment which extended the eminent domain redevelopment power, as they led to the RTC's conclusions that physical and economic blight existed within the project area, but the record did not support that reliance.

In an underlying finding, the trial court concluded that the administrative record nevertheless contained "substantial evidence" of a condition of economic blight (by using crime statistics City-wide).  However, since the record failed to contain "substantial evidence of at least one condition of physical blight," and since both findings were needed, the Amendment was declared invalid.  (§§ 33030, subd. (b); 33031, subds. (a), (b); 33333.2, subd. (a)(4).)

Additionally, the trial court issued declaratory relief on the ground that the City had violated the PRA, by failing to produce at the request of CYAC certain documents about the same two types of underlying raw data relied upon in the RTC (field surveys of blight conditions, and property-by-property crime data), which the City had used to justify its blight claims.

---

[2]     Section 33457.1 provides:  "*To the extent warranted by a proposed amendment to a redevelopment plan*, (1) the ordinance adopting an amendment to a redevelopment plan shall contain the findings required by Section 33367 and (2) the reports and information required by Section 33352 shall be prepared and made available to the public *prior to the hearing on such amendment*."  (Italics added.)  Section 33367, subdivision (d) requires the redevelopment ordinance or amendment to include findings of, inter alia, its necessity to alleviate blight conditions, "based on clearly articulated and documented evidence."

4

Further, the court determined that the federal procedural due process rights of CYAC and the public had not been adequately protected by the City during the amendment process, due to the City's failure to comply with CRL statutory requirements or to grant a continuance of the hearing. The court issued declaratory relief finding federal due process violations and awarded nominal damages ($1). (U.S. Const., 14th Amend. [due process clause]; *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*).) However, CYAC's alternative California Constitution due process causes of action were found to lack merit. (Cal. Const., art. I, §§ 7(a), 19 [due process and takings clauses].)

After trial, the court ordered the City to pay substantial attorney fees to CYAC ($1,906,516.75) and to the Interested Parties ($84,652.50). The court had initially determined that their requests were untimely filed, but that discretionary relief from default should be granted to entertain the fees motion. (Cal. Rules of Court, rule 3.1702; all further rule references are to the California Rules of Court; Code Civ. Proc., § 473, 1021.5; 42 U.S.C. § 1988; Gov. Code, § 6259, subd. (d).)

The City appeals the judgment and in the consolidated appeal (D061141), the fee orders. CYAC has filed a cross-appeal of a portion of the underlying findings on the reverse validation decision (to challenge the trial court's ruling regarding economic blight, that City-wide crime data was correctly considered by the City, rather than just project-wide data). (§ 33031, subd. (b)(7); CYAC does not cross-appeal the dismissal of its California Constitution claims.)

CYAC has also cross-appealed on a timeliness issue regarding its attorney fees request, since the trial court granted CYAC and the Interested Parties discretionary relief

5

from the untimely filing, then awarded fees. However, CYAC contends there was no late filing in the first place that gave rise to any such need for such relief. (Rule 3.1702; Code Civ. Proc., § 473.)

In a previous order, we granted in part and denied in part the City's judicial notice request, to permit additional materials on the attorney fee questions to be considered on appeal. (See part V, *post*.)[3]

On the merits of the appeal and cross-appeal, first, our review of the administrative record persuades us that the trial court's reverse validation order is well supported by the facts and the law, concerning the CRL violations of sections 33352 and 33457.1 (map requirement and description of specific, quantifiable evidence supporting the blight findings). Although the Legislature abolished redevelopment agencies through its 2011 legislation, the issues regarding the invalidity of this Amendment have not become moot by the passage of time or the subsequent legislative action, particularly as to the attorney fees awards. (§ 33037, subd. (c); *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231 (*Matosantos*) [discussed *post*].)

Next, on the trial record of the PRA issues, which includes both the administrative record and the trial exhibits and testimony, we uphold the judgment of the trial court issuing declaratory relief in favor of CYAC. Although we disagree with some of the

---

3    We denied the City's judicial notice request on appeal of the United States Environmental Protection Agency's Brownfields Studies of March 2005 ("Brownfields Studies") which previously studied contamination in the Amendment area. The trial court refused to include it as part of the administrative record, or to take judicial notice of it, or to admit that material as trial exhibit No. 501.

reasoning set forth in the statement of decision, the particular theory of the trial court is not controlling, and it reached the correct result. (Gov. Code, § 6250 et seq.; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 (*D'Amico*).) We shall affirm the declaratory relief judgment on the reverse validation and PRA issues.

However, the judgment must be reversed in part with respect to the trial court's erroneous determination that as a matter of law, the City's proven statutory violations of the CRL additionally amounted to an actionable deprivation of federal due process protections, under the appropriate legal test. (*Mathews, supra*, 424 U.S. 319.)[4] Although CYAC properly pursued its remedy in the reverse validation action, to challenge such a blight designation amendment within the statutory limitations period (only 90 days; §§ 33500 or 33501), at this point, CYAC or the Interested Parties still cannot show their essential property interests were actually or potentially affected at the level necessary to satisfy the above-cited due process test.[5] There was no eminent domain filing by the City, nor had CYAC brought any inverse condemnation action, to crystallize its

---

[4]    The *Mathews* procedural due process analysis requires the courts to consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and (3) the Government's interest, including any administrative burden that additional procedural requirements would entail. (*Mathews, supra,* 424 U.S. 319, 335.)

[5]    Section 33500 now provides: "(a) Notwithstanding any other provision of law, including Section 33501, an action may be brought to review the validity of the adoption or amendment of a redevelopment plan at any time within 90 days after the date of the adoption of the ordinance adopting or amending the plan, if the adoption of the ordinance occurred prior to January 1, 2011." Subdivision (b) is similar for review of agency findings. Section 33501 prescribes use of the validation statutes, Code of Civil Procedure section 860 et seq., for such CRL challenges.

7

immediate property interests as protectable under federal due process standards during this early stage redevelopment amendment proceeding. (*Cambria Spring Co. v. City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1097-1098 (*Cambria Spring Co*.).)

Accordingly, we affirm the judgment in part but reverse the grant of declaratory relief on the due process theory, with directions to enter a different order. On the attorney fees issues, we find the trial court appropriately granted CYAC and the Interested Parties discretionary relief from any applicable filing deadlines for their fees request, but we reverse the orders awarding such fees and costs to the extent that they incorrectly relied upon Title 42 United States Code section 1988 or Code of Civil Procedure section 1021.5 (the due process conclusions). Upon remand, the trial court shall reevaluate the extent to which such an award of fees and costs continues to be justified in light of the remaining statutory grounds for relief that we upheld in this opinion, in accordance with the principles of Code of Civil Procedure section 1021.5 and Government Code section 6259.

BACKGROUND FACTS AND PROCEDURE

*A. Ordinance and Complaint; Prior Appeal on Publication*

In broad outline, with more specialized facts to be added in the discussion portion of this opinion, the City's 1995 redevelopment plan and its amendments (the plan) authorized the use of eminent domain in the area where the CYAC and Interested Parties' properties are located, based on designations of blight. (§ 33037, subd. (c).) There are 692 parcels in the overall 300-acre Amendment area. On its parcel, CYAC operates a

8

boxing gym and athletic facility that serves at-risk youth as a community center. The Interested Parties and their lessees conduct business on their property.

As proposed, the 2007 Amendment reduced the area subject to eminent domain and restricted its use on residential properties, and focused on two business corridors (Civic Center Drive and National City Boulevard) and the harbor district area, where some environmental contamination existed due to previous industrial uses there. The City sought to amend the plan to extend the time for eminent domain proceedings to be conducted under redevelopment powers until 2017. The City was interested in allowing the construction of condominium developments in the designated area, as a redevelopment measure.

In preparation for amending the plan, the City's Commission hired the consulting firm of RSG, an independent contractor, to prepare reports required under the CRL. RSG assisted the Commission (sometimes designated the agency) in preparing and publishing the initial notice of the public hearings on the Amendment, both through mail notice to taxing agencies and through newspaper publication. From February 2007 to June 2007, RSG was in the process of drafting its report to the council (the RTC) on the need for the Amendment. RSG's contract with the City's Commission provided that this agency would have the property rights to the memoranda, reports, maps, drawings, plans, specifications and other documents prepared by RSG for the project, and all of these would be turned over to the agency upon completion of the project.

On April 17, 2007, a hearing was held by the City Council to adopt a resolution to authorize circulation and public review of the Amendment, and to set a public hearing for

9

June 19, 2007 to consider adoption of the Amendment. The Council's agenda statement attached a map indicating the boundary around the parcels that would be subject to the Amendment (the "boundary parcel map").

In May 2007, notice of the June hearing was mailed to all affected tax agencies, and to all affected property owners, businesses and residents. The same boundary parcel map that was attached to the April 17, 2007 Council Agenda Statement was also provided with the May 11, 2007 mailing.

In May 2007, CYAC retained expert witnesses to oppose the Amendment and began the process of requesting numerous documents that related in any way to the proposed amendment for the project area, which included CYAC. On May 23, it sought "Any and all blight studies that have been performed that specifically deal with National City Boulevard and its surrounding areas or any other blight studies that have been performed for National City since 2000. Please include any documents that show the actual areas the City or CDC included in conducting the blight study. [¶] Any and all blight studies the CDC or City will rely on in support of the redevelopment plan or eminent domain proceedings." CYAC's May 23 request relied upon the federal Freedom of Information Act (FOIA). (5 U.S.C. § 552 et seq.)[6]

City staff members responded to CYAC that such a "blight study" was also called the RTC, and that the City planned to make it and other reports available approximately

_____

[6] Judicial interpretations of the FOIA in the federal courts may be used to construe the PRA. (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325; *American Civil Liberties Union of Northern California v. Superior Court* (2011) 202 Cal.App.4th 55, 68 (*ACLU*).)

three days before the public hearing, pursuant to the standards of the Brown Act. (Gov. Code, § 54954.2, subd. (a).)

In June 2007, the City published three weekly notices in local newspapers, to give notice of the upcoming June 19, 2007 public hearing. On June 14, 2007, three business days before the hearing, the City released to the public for review its 37-page RTC recommending adoption of the Amendment. The RTC detailed in writing different types of blight conditions that it found were remaining in the Amendment area, and stated it had relied on six major sources in that analysis and assessment, including "the April 2007 field survey by RSG," and "Information from the National City police department." The RTC concluded that such blight could not be eliminated without the use of eminent domain.

The RTC referred in passing to 2005 findings by the United States Environmental Protection Agency (the Brownfields Studies) about environmental contamination existing in part of the Amendment area. (See fn. 3, *ante*.) No map was attached to the RTC made available to the public, to show where in the project any particular blighting conditions existed. (See fns. 1, 2, *ante*, text of CRL statutes requiring such a map.)

On June 15, 2007, CYAC sent three PRA requests to the City, referencing the same boundary parcel map that had been attached to the April 17, 2007 council agenda and the City's notice of hearing. On June 17, 2007, CYAC, represented by a law firm, the Institute of Justice, sent a letter to the City objecting to the Amendment on various statutory and constitutional grounds.

11

At the June 19, 2007 public hearing, the City Council heard opposition from CYAC and the Interested Parties and other citizens to the adoption of the Amendment. CYAC filed 34 pages of written objections to the Amendment. CYAC obtained permission from the City to file its six-volume appendix in opposition to the plan. The City denied CYAC's request for a continuance of the hearing, but allowed its additional written objections to be received after the hearing.

In July 2007, the City Council approved a negative declaration for the Amendment, and prepared written responses to written objections to the Amendment, as filed by members of the public.

On July 10, 2007, the City provided to the public four maps of the Amendment area showing the different types of blighting conditions on which it relied as justification for the Amendment (i.e., structural obsolescence, incompatible adjacent uses, deterioration and dilapidation, or defective design without parking). (§ 33352, subd. (b).) On July 17, 2007, the ordinance approving the Amendment was adopted, incorporating by reference documents contained in earlier studies.[7]

After several more PRA requests and much further communication, discussion, clarification, and objections taking place between June and August 2007, the City

---

[7] In the reply brief, the City, after first admitting in the opening brief that no map was attached to the council's copy of the RTC in June 2007, now contends that the boundary parcel map was timely provided to the council. This was the same boundary parcel map that had been provided with the May 2007 mailed notice to taxing agencies and property owners. However, it is still not disputed that the more detailed maps later provided in July 2007, identifying the four types of claimed blighting conditions, were not attached to the RTC when it was made available to the council or the public June 14, 2007.

12

supplied at least three additional sets of informational documents to CYAC. (See pts. II, III, *post*.)

In September 2007, CYAC brought this action seeking a judicial declaration that the Amendment was invalid on a number of specific grounds, including noncompliance with the procedures of the CRL. In particular, its first, fifth, and sixth causes of action alleged that the City failed to release or complete its reports or maps on the matter in a timely fashion, thus preventing the public from preparing any effective objections to the proposed Amendment, or from obtaining documents related to the required substantial evidence of existing blight and alleviation of blight through the proposed redevelopment.

In its second cause of action alleging violations of federal constitutional protections, CYAC contended it was deprived of procedural due process of law affecting the proposed use of its property (U.S. Const., 14th Amend.). In its third and fourth causes of action alleging state constitutional violations, CYAC claimed the eminent domain law was being used for constitutionally illegitimate purposes, such as economic development or increasing tax revenue. All these constitutional claims were alleged separately from the statutory causes of action. The prayer requested a declaration that the City had violated CYAC's procedural due process rights to a meaningful opportunity to be heard, and it sought invalidation of the ordinance and other relief (injunction and damages).

In its seventh cause of action, CYAC sought to compel the City to disclose numerous public records relied on by the City to support the blight designations underlying the Amendment. (PRA, Gov. Code, § 6250 et seq.)

13

As explained in two prior opinions issued by this court, CYAC obtained a court order through noticed ex parte proceedings for the publication of the summons, which was directed toward the City and to "All Persons Interested in the Matter of the Amendment to National City's Redevelopment Plan as Adopted by [the ordinance]." (*Community Youth Athletic Center v. City of National City* (2009) 170 Cal.App.4th 416 (our prior opinion); *Community Youth Athletic Center v. Superior Court* (Feb. 18, 2009, D052630) [nonpub. opn.] [reversing the judgment on the separate PRA petition; some facts stated here have been adapted from those opinions].) CYAC encountered difficulties with the publication process in English and Spanish newspapers, when one of the newspapers unexpectedly changed its publication schedule, and ultimately, the summons that was published after some delay retained an incorrect date for responses by any interested parties (i.e., the published summons contained the date for response as originally anticipated, thus advancing the allowable response period following publication, from Monday, Nov. 19 to Friday, Nov. 16, 2007). (Code Civ. Proc., §§ 861, 861.1, 863 [part of the Validation Act].)

The City then moved for judgment on the pleadings on all causes of action, claiming defective publication. The trial court ruled in favor of the City, and CYAC appealed. We reversed, allowing republication and further notice proceedings.

### B. Renewed Litigation After 2009 Prior Appeal

Back on track, the parties negotiated the contents of the administrative record, for purposes of litigating the reverse validation issues. The administrative record was lodged

14

with the trial court in February 2011. The Interested Parties were granted leave to appear and respond, pleading similar theories.[8]

Extensive motion practice continued, in which CYAC pursued a motion for summary adjudication on the PRA claims, opposed by the City. The court denied the motion, ruling that there were remaining disputed material facts about whether the raw data regarding the blight studies created by the private consultant, RSG, constituted public records subject to disclosure.

Discovery disputes ensued, followed by motions to compel production of records or quash subpoenas. The City pursued a summary adjudication motion on the CYAC constitutional claims, both federal and state. Opposition was filed. The court denied the motion, ruling that the City could not establish on the undisputed evidence that CYAC had been afforded sufficient notice and documentation of the blight conditions to satisfy due process standards. The court relied on the test in *Mathews*, *supra*, 424 U.S. 319, and stated "what passes muster for constitutional due process is fact dependent." The court also ruled that the City had not yet established whether the two California constitutional claims, alleging wrongful taking of property, were totally without merit, since CYAC was also alleging that the process of adopting the redevelopment plan and blight designation was commenced for improper purposes.

---

[8]    In their reply brief, the Interested Parties state they are responding to the City's appeal only on the reverse validation and attorney fees issues. Their responsive pleading is in the nature of a cross-complaint that asserts CRL violations. (Code Civ. Proc., § 863.)

In preparation for trial, the City sought to sever the PRA issues, but the court denied the motion. It had become known that the City's consultant RSG had routinely purged its records after completing the RTC, and had not retained copies of the raw data in the form of its field survey spreadsheets that were compiled by staff persons who walked the area to be covered by the Amendment, as they investigated physical blighting conditions.

Back in May 2007, the City police department's crime analyst sent RSG a chart containing three years of crime data (the "three-year chart") which RSG used to prepare a table of crime rates from 2006 for the RTC. However, the raw data used by the City's analyst to prepare the three-year chart was no longer available.

CYAC brought a motion seeking an order for sanctions for alleged spoliation of both kinds of that "critical evidence." The City filed opposition. The court denied the motions, ruling there was no evidence from which the court could reasonably infer intentional or willful conduct by City agents or employees to destroy either the raw data used by the consultant (field surveys) or any background data compiled by the City police department (crime statistics).

Trial briefs and motions in limine were filed, as well as motions for judicial notice. In limine, the court ruled that with respect to the reverse validation claims, review was limited to the administrative record.[9] However, on the PRA and constitutional issues,

---

9     Apparently, neither the crime table referred to in the RTC, or the three-year chart that had been supplied to RSG for study, was actually included in the RTC or in the administrative record. However, the RTC discusses its conclusions, and the three-year

testimony and trial exhibits going beyond the administrative record were allowed to be presented, and a lengthy bench trial took place. The parties requested a statement of decision and prepared drafts.

### C. 2011 Statement of Decision and Judgment; Attorney Fees Awards

In its April 20, 2011 statement of decision, the trial court found on the reverse validation claims that the City's lack of compliance with CRL requirements resulted in a lack of support for the Amendment, due to the failure to include the required map attachment in the RTC. (§ 33352, subd. (b).) Additionally, the court ruled the administrative record did not contain "specific, quantifiable evidence about the location and prevalence of the alleged blighting conditions," to show a serious physical and economic burden on the community, as required by section 33030, subdivision (b)(1) and section 33352, subdivision (b)(2). Even though the RTC and administrative record contained "substantial evidence" of one condition of economic blight (using crime statistics City-wide), they still "did not have substantial evidence of at least one condition of physical blight." (§ 33031, subds. (a), (b).) Thus, even if some blight conditions existed in the Amendment area, the administrative record did not contain substantial evidence that there were substantial and prevalent amounts of blighting conditions, or that any such conditions could not be eliminated without the use of eminent domain. (§ 33333.2, subd. (a)(4).) Declaratory relief was issued invalidating the Amendment.

chart submitted to RSG by the police department was admitted as an exhibit at trial. The court also granted CYAC's request to augment the administrative record, to include fire dispatch reports previously requested to be produced. However, the court denied a CYAC request to augment the record with certain evidentiary presumptions.

On the PRA, the trial court's key findings were (a) both forms of raw data relied on by the RTC and the City, the property-by-property field surveys conducted by RSG and the property-by-property crime data for three years before the PRA request was made, constituted public records; (b) CYAC's various PRA requests were not unduly broad or vague, and thus (c) the City did not undertake a reasonable search for the requested information, nor carry its burden of showing that it justifiably withheld public records that were in the possession of its consultant, RSG, or in the possession of its police department when the requests were made. Specifically, "The Court holds that a reasonable search requires the agency to: (1) ask the known custodian of records for (2) *the documents requested in the PRA request*." (Italics added.) Thus, the court impliedly found that the City should have conveyed to the consultant the same request language that CYAC sent to the City. Although the court stated the City staff members had demonstrated evident neglect of their duties, the court was "not convinced that the violations of the PRA were intentional or that the City refused to attempt to obtain documents from its consultant." The court issued declaratory relief finding such violations of the PRA, but denied any injunctive relief, on the basis there was no showing of any need for prospective relief.

Regarding federal due process, the trial court made a series of rulings. First, the City was found to have violated "CYAC's right to procedural due process under the Fourteenth Amendment with respect to its failure to timely provide the maps with the RTC, *which were required by statute*." (Italics added.) The trial court determined that the "City's decision to provide CYAC with the RTC only three business days before the

18

public hearing, and at that time its failure to provide any underlying data and without the required maps, created an unreasonable risk of erroneous deprivation," denying CYAC its procedural due process rights. The trial court also concluded, "at a minimum, a continuance of the public hearing upon request was required."

In its federal due process findings, the trial court continued: "The evidence in this case presents a troubling picture where the [City] appears to have intentionally provided notices and scheduled all of the public hearings so as to provide as little time as possible to meaningfully prepare any opposition. The RTC itself was vaguely written." The City had compounded this process by failing to provide the statutorily required maps with the RTC, by failing to respond promptly to PRA requests for crime data and property survey information, by unjustifiably claiming the survey data were not public records, and by failing to secure that information during litigation to prevent it from being destroyed. (§ 33352, subd. (b).)

However, to the extent that CYAC seemed to be making a constitutional challenge to section 33457.1 (either facially or as applied), the trial court found that the notice and access to the RTC as provided by the City, pursuant to that section, did not create a further or broader denial of due process. (See fn. 2, *ante*.) Essentially, the court found the City had substantially complied with the notice requirements of section 33452, and CYAC had been able to protect its rights and to prepare and submit extensive opposition to the Amendment, based upon its own investigation and the material made known to it.

The court thus declined to make a broad finding that any particular number of weeks or months of access to the RTC must have been provided to the public by the City,

19

pursuant to the terms of section 33457.1. Declaratory relief and $1 in nominal damages were awarded to CYAC. With respect to the claims under the California Constitution, the court found them to be premature due to the lack of any eminent domain proceedings that had been initiated by the City. Judgment was issued in favor of CYAC.

Following requests for prevailing party attorney fees and costs by CYAC and the Interested Parties, the trial court granted them relief from default for late filing pursuant to Code of Civil Procedure section 473, subdivision (b), based on its interpretation of rule 3.1702 and related provisions. (Rules 8.104, 8.108.) The court ruled on the merits that both CYAC and the Interested Parties were entitled to attorney fees awards under several statutory provisions, including Title 42 United States Code section 1988, Code of Civil Procedure section 1021.5 and Government Code section 6259, subdivision (d). (Further details will be set forth in pt. V, *post*.)

## DISCUSSION

## I

### *OVERVIEW AND INTRODUCTORY REMARKS*

We will set forth the respective standards of review and statutory schemes as we discuss, in turn, the grant of declaratory relief on the reverse validation issues about CRL procedural protections for such a redevelopment plan amendment, and the application of the PRA standards in this factual and legal context. (Pts. II, III, *post*.) We can then address the propriety of the declaratory relief issued on the federal due process issues, as well as the attorney fees issues, both on the appeal and cross-appeal. (Pts. IV, V, *post*.)

20

In all of our analyses, we are mindful that in its 2011 legislation (§§ 34170 et seq., 34161 et seq.), the Legislature prospectively abolished all redevelopment agencies, reallocated their funding, and delegated their work to successor agencies. In *Matosantos, supra*, 53 Cal.4th 231, our Supreme Court held that because the Legislature had created redevelopment agencies in the CRL, it had the power to dissolve those agencies through subsequent legislation. (11 Miller & Starr, Cal. Real Estate (3d ed. 2012-2013 supp.), § 30B:0.10, pp. 45-46.)[10] Accordingly, this exact form of redevelopment method of condemnation will not be pursued by a City commission that no longer exists. (§ 33037, subd. (c); *California Redevelopment Association v. Matosantos II* (2013) 212 Cal.App.4th 1457, 1485 [issues on the existing obligations or duties of redevelopment agencies before their dissolution are not moot, where successor agencies have taken over their functions].) The briefs on appeal have only minimally addressed this dramatic legal development.[11]

We are required to review the existing ordinances and redevelopment actions in the time frame in which they were conducted, in this case, 2007. (See *County of Los*

---

[10] On another point, the Court in *Matosantos, supra*, 53 Cal.4th 231 invalidated a provision that would have provided for the continuation of redevelopment agencies if the local governing body agreed to make substantial payments to fund education and other functions. (*Id.* at pp. 274-276.)

[11] Formerly, redevelopment agencies addressed problems of urban blight using "three extraordinary powers--the diversion of property taxes that otherwise would have gone to the state or other government entities; the use of public funds to subsidize private enterprise; and the power of eminent domain." (*Neilson v. City of California City* (2007) 146 Cal.App.4th 633, 642; *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1131 (*Evans*).)

*Angeles v. Glendora Redevelopment Project* (2010) 185 Cal.App.4th 817, 832

(*Glendora*).) We do not speculate what action the City may take in the future to pursue

any eminent domain powers based on blight designations within the area affected by the

Amendment. In any case, the eminent domain powers controlled by Code of Civil

Procedure section 1230.010 et seq. were not directly affected by the 2011 redevelopment

legislation. (§ 33037, subd. (c).) The attorney fees issues raised in this appeal serve to

keep these validation and related issues alive, despite the major changes in

redevelopment law.

Our review of the judgment is conducted in view of the trial court's issuance of a

detailed statement of decision that addressed each of the above-described substantive

areas. When reviewing a judgment based on such a statement of decision, "any conflict

in the evidence or reasonable inferences to be drawn from the facts will be resolved in

support of the determination of the trial court decision." (*In re Marriage of Hoffmeister*

(1987) 191 Cal.App.3d 351, 358.) The ultimate facts found in the court's statement of

decision necessarily include findings on the intermediate evidentiary facts that sustain

them. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.)

Although the statement of decision reveals the basis for the judgment, all of its

reasoning is not treated as binding on an appellate court. (*D'Amico*, *supra*, 11 Cal.3d 1,

18-19.) To the extent the record presents an undisputed or established set of facts, the

interpretation and application of a statutory scheme to those facts are treated as questions

of law and are subject to de novo review on appeal. (*Blue v. City of Los Angeles* (2006)

137 Cal.App.4th 1131, 1140 (*Blue*).) With regard to validation proceedings, the

22

undisputed set of facts is to be measured against the standards set by those statutes. (*Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1031 (*Katz*).) This appellate court is not bound by the trial court's statutory interpretations. (*Blue, supra,* at p. 1140; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.)

Essentially, these parties do not dispute that the trial court correctly stated each of the statutory standards for deciding the claims under the CRL and PRA regulatory schemes, but they each challenge portions of the trial court's interpretation and application of those standards to the facts as established by the evidence, and they also argue the sufficiency of that evidence. (*Glendora, supra,* 185 Cal.App.4th 817, 835-836 [administrative record must contain substantial proof of essential statutory criteria].) When the trial court applied federal procedural due process standards to that same set of established facts, it stated it was doing so narrowly and was rejecting CYAC's broader requested ruling. With respect to each of the operative components of the judgment, our task on appeal is to independently construe the statutory protections and evaluate the sufficiency of the supporting evidence for the legal conclusions reached. With those caveats, we turn to the substantive questions presented.

II

*REVERSE VALIDATION DECLARATORY RELIEF*

A. Validation Law and CRL

Under section 33501, CRL litigation may be framed as validation or reverse validation actions. These actions promote the important public policy of securing a

23

speedy determination of the validity of certain actions taken by a public agency. (*McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1166-1167 (*McLeod*); Code Civ. Proc., § 860 et seq.) Such in rem proceedings require notice to all those persons potentially interested in the issues of public interest presented (here, redevelopment and eminent domain). (*Katz, supra,* 144 Cal.App.4th 1024, 1028.) Under Code of Civil Procedure section 866, "[t]he court hearing the action shall disregard any error, irregularity, or omission which does not affect the substantial rights of the parties."

" 'The scope of judicial review of an agency's decision to adopt a redevelopment plan is quite limited. Both the trial court and this court review the administrative record to determine whether the findings and decision of the legislative body are supported by substantial evidence.' [Citations.] Appellate 'review is done independent of any determinations made by the superior court.' [Citations.] [¶] In examining the administrative record, we resolve all ' "reasonable doubts" ' and 'accept all reasonable inferences supporting the administrative findings.' [Citation.] 'The fact that different inferences or conclusions could be drawn, or that different methods of gathering and compiling statistics could have been employed, is not determinative in a substantial evidence review.' " (*Glendora, supra*, 185 Cal.App.4th 817, 835-836.)

On appeal, this court independently " 'determine[s] the law applicable to the facts in the administrative record' in assessing whether the statutory requirements have been met. [Citations.]" (*Glendora*, *supra*, 185 Cal.App.4th 817, 836.) We review de novo the legal issues involving the interpretation and application of statutes. (*Ibid.*, citing *Blue, supra*, 137 Cal.App.4th 1131, 1140.) We confine this review to the issues presented by

24

the administrative record, without use of the additional evidence presented at trial.  (See

*Glendora, supra*, at pp. 828-831, 835.)

To review the sufficiency of the evidence supporting the trial court's conclusions

invalidating the Amendment, we are guided by the CRL sections outlining the

characteristics of blighted areas that give rise to a need for redevelopment.  "[A]n area is

blighted, and hence eligible for redevelopment, if it is predominantly urban and if it is

adversely affected by economic and physical conditions too serious to be cured by private

or governmental enterprise, thus necessitating redevelopment."  (*County of Riverside v.*

*City of Murrieta* (1998) 65 Cal.App.4th 616, 624-625 (*Riverside*).)

In 2006, the Legislature made important, applicable changes in the redevelopment

law, imposing more restrictions on the definitions and proof of blighting conditions.

(*Glendora,* 185 Cal. App. 4th 817 at p. 832.)  Section 33030 refers, inter alia, to the

definitions of conditions that cause physical blight (§ 33031 (subd. (a)), and economic

blight (§ 33031, subd. (b)).  Formerly, section 33031, subdivisions (a)(1) and (2) each

contained general language allowing "other similar factors" to be used to support a

physical blight designation, but in 2006, the Legislature removed that general language.

The Legislature also added language to section 33352 that required "specific [and]

quantifiable evidence" to document alleged blight conditions to be included in the reports

prepared for the legislative body, here, the City Council.[12]  The same reports and

---

12    As part of the 2006 amendments, section 33352 was amended to add the italicized
language, showing a more restrictive approach to documenting blight:  "Every
redevelopment plan submitted by the agency to the legislative body shall be accompanied

information required by section 33352 must, under section 33457.1, be made available to the public prior to the redevelopment amendment hearing.[13]

Under section 33333.2, subdivision (a)(4), the 12-year time limitation for eminent domain ordinance authorizations may be extended only by amendment of the redevelopment plan after the agency finds, based on substantial evidence, both of the following: "(A) *That significant blight remains within the project area. [¶] (B) That this blight cannot be eliminated without the use of eminent domain*." (Italics added.) Given the nature of the amendment to the redevelopment plan, new blight findings were warranted and required by section 33457.1. *(Blue, supra,* 137 Cal.App.4th at p. 1149; *Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116, 120-121.) " 'Tangible proof which can be scrutinized in a meaningful way,' " is required. (*Glendora, supra,* 185 Cal.App.4th at p. 836.)

---

by a report containing all of the following: [¶] (b) A description of the physical and economic conditions specified in Section 33031 that exist in the area that cause the project area to be blighted. The description shall include a list of the *physical and economic conditions* described in Section 33031 that exist within the project area and a map showing where in the project the conditions exist. *The description shall contain specific, quantifiable evidence that documents both of the following: [¶] (1) The physical and economic conditions specified in Section 33031. [¶] (2) That the described physical and economic conditions are so prevalent and substantial that, collectively, they seriously harm the entire project area*." (Stats. 2006, ch. 595, § 1(e), p. 3777; italics added.)

[13]    The historical and statutory notes provided with section 33030 further explain that in 2006, the Legislature also amended sections 33500 and 33501 with the intent to lower the barriers for interested public members to challenge local officials' decisions regarding redevelopment and, in particular, to increase the opportunities for review of local officials' findings regarding the conditions of blight. (Historical and Statutory Notes, 41 West's Ann. Health & Saf. Code (2010 ed.) foll. § 33030, p. 451; Stats. 2006, ch. 595, § 1(f), p. 3778; see due process discussion, pt. IV, *post*.)

26

## B. CRL Rulings

Many of the topics in the trial court's detailed analysis of the various blight showings regarding CYAC's reverse validation claims (first, fifth and sixth causes of action) are not directly discussed or attacked in this appeal and cross-appeal. We focus on the two major defects that prevented enforceability of this Amendment, and that are challenged on appeal: (1) the RTC omitted maps showing the location of blighting conditions that should have been made available before the time of the June 2007 public hearing under section 33352, subdivision (b) and section 33457.1; and (2) the administrative record, overall, lacked "specific, quantifiable evidence about the location and prevalence of the alleged blighting conditions" under the definitions of section 33352, subdivision (b) (referring in turn to § 33031), such that the administrative record "did not have substantial evidence of at least one condition of physical blight."[14] In particular, the RTC had relied on the field surveys prepared by the consulting firm RSG, but those field surveys had later been purged from their files and were not available for production by the City.

---

14    Section 33031 subdivision (a) describes *physical conditions* that cause blight: "(1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions may be caused by serious building code violations, serious dilapidation and deterioration caused by long-term neglect, construction that is vulnerable to serious damage from seismic or geologic hazards, and faulty or inadequate water or sewer utilities. [¶] (2) Conditions that prevent or substantially hinder the viable use or capacity of buildings or lots. These conditions may be caused by buildings of substandard, defective, or obsolete design or construction given the present general plan, zoning, or other development standards." (Note, no issues are raised here on additional subdivisions of § 33031, subd. (a)(3) regarding adjacent or nearby incompatible land uses; or subd. (a)(4) regarding existence of subdivided lots in multiple ownership.)

27

Even though the trial court determined that the administrative record contained "substantial evidence" of one condition of economic blight (by using crime statistics City-wide), the RTC still "did not have substantial evidence of at least one condition of physical blight." (§ 33031, subds. (a), (b).) And, even accepting that some blight conditions existed in the Amendment area, the court found the administrative record did not contain substantial evidence that there were substantial and prevalent amounts of blighting conditions, or that they could not be eliminated without the use of eminent domain. (§§ 33333.2, subd. (a)(4); 33030, subd. (b)(1); 33352, subd. (b)(2).)

In its cross-appeal, CYAC attacks the ruling there was some evidence of economic blight, claiming it was error for the trial court to use crime statistics City-wide. (§ 33031, subd. (b)(7).)[15] Rather, CYAC argues such economic conditions evidence is only relevant project-wide under section 33352, subdivision (b), and it further complains that the raw data underlying the crime statistics table referred to in the RTC (but left out) were not produced by the City, even though the police department analyst possessed the raw data at the time she prepared the three-year chart and sent it to RSG so it could prepare the RTC and table. Since evidence of both types of conditions was required, the Amendment was invalidated, and we shall discuss the cross-appeal's economic blight

_____

[15] Section 33031, subdivision (b) describes *economic conditions* that cause blight: "(1) Depreciated or stagnant property values. [¶] (2) Impaired property values, due in significant part, to hazardous wastes on property where the agency may be eligible to use its [specified] authority . . . . [¶] . . . [¶] (7) A high crime rate that constitutes a serious threat to the public safety and welfare."

28

issues only if the trial court erred in its physical blight analysis. (§§ 33030, subd. (b); 33333.2, subd. (a)(4).)

## C. Analysis: Appeal

### 1. Defects in Notice of Hearing and Issuance of RTC

Under sections 33457.1 and 33352, supporting reports and information must be provided to the public before a redevelopment plan is amended, "prior to the hearing," but no time frame is stated. (*Blue, supra*, 137 Cal.App.4th at p. 1144.) In that case, the court interpreted section 33352, subdivision (b), as not requiring the raw data regarding blight conditions to be included in the report or elsewhere in the administrative record, "in order for a redevelopment plan to be found valid." (*Blue, supra,* at p. 1142.) However, the court in *Blue* was interpreting the previous version of that section, which did not contain the recently added language requiring "*specific, quantifiable evidence that documents both of the following: [¶] (1) The physical and economic conditions specified in Section 33031. [¶] (2) That the described physical and economic conditions are so prevalent and substantial that, collectively, they seriously harm the entire project area*." (§ 33352, subd. b; italics added.) More support is now required, but the City seems to have been operating under the previous version of the law.

The requirements for the RTC containing an attached map showing blight conditions prior to the hearing were admittedly not met. However, the City appears to argue on appeal that the administrative record as a whole sufficiently and substantially supports the Amendment, because this court should find it determinative that the original boundary parcel map was given to affected landowners with the notice of hearing, and

29

later, four more detailed maps were provided to the public a week before the adoption of the Amendment in July (showing the four alleged blighting conditions, under § 33031 definitions).

In its related due process ruling, the trial court determined that the publication of the RTC only three business days before the public hearing, and the failure by the City to provide any underlying data or the required maps at that time, "created an unreasonable risk of erroneous deprivation" of CYAC's procedural due process rights. In any case, the trial court said that with respect to the validation claims, even if the late filed maps were considered, they still did not contain any substantial evidence "that there is a substantial amount of this blight or that this blight cannot be eliminated without the use of eminent domain." (§ 33030, subd. (b).)

We reject the City's positions that it substantially complied with the CRL requirements, or that overall, the administrative record supports the Amendment. First, under section 33352, subdivision (b), regarding the provision of information by the redevelopment agency to the legislative body (City), the RTC was mandated to include the following: a description of the physical and economic blighting conditions in the project area, including "*a map showing where in the project the conditions exist*." This description shall contain "specific, quantifiable evidence" documenting the conditions, and showing that the "physical and economic conditions are so prevalent and substantial that, collectively, they seriously harm the entire project area." (§ 33352, subd. (b).) The boundary parcel map originally sent out by the City with notice of the hearing, and provided to the City Council in the RTC, did not show any such conditions. The maps

30

later sent out to the public July 10, before the final approval of the Amendment on July 17, delineated the four types of conditions relied upon: structural obsolescence, incompatible adjacent uses, deterioration and dilapidation, and defective design without parking. (§ 33352, subd. (b); however, parking is now a relevant concern only with regard to development standards under § 33031, subd. (a)(2).) Some of these four condition maps were apparently supported by the field surveys, which were unavailable to CYAC. (See also pt. III, *post,* PRA topic.)

With respect to the map requirement for the RTC, section 33457.1 additionally required that, "*To the extent warranted by a proposed amendment to a redevelopment plan* . . . the reports and information required by Section 33352 shall be prepared and made available to the public *prior to the hearing on such amendment*." (Italics added.) Thus, the trial court was required to make a statutory interpretation of section 33457.1, to rule on the extent that this Amendment "warranted" disclosure of the information required by section 33352, and when. The court reasonably concluded that it was not enough, under this statutory restriction, for the City not to disclose that required information with maps until a week before the approval of the Amendment. Earlier, the City had provided a different map and an incomplete RTC three business days before the public hearing of June 19, but that was not enough to constitute substantial compliance with either of those requirements.[16]

---

16  In our discussion of the due process arguments on appeal (pt. IV, *post*), we will address to the extent necessary CYAC's argument that we should judicially impose a time deadline for disclosure of reports, as an interpretation of section 33457.1 (such as 60-90

The City relies on *Blue, supra,* 137 Cal.App.4th at page 1145, to argue that even though the map was not timely provided nor a continuance granted, CYAC was able to prepare extensive opposition and objections, it could have conducted more of its own investigation, and thus it should not be deemed to have suffered any prejudice in preparing its opposition. However, the court could reasonably have concluded, and impliedly did, that a more focused investigation would have been possible if the statutory compliance had been forthcoming, with the use of a map identifying the location of the blighting conditions being relied upon in the RTC. We agree with the findings of the trial court that this sequence of events in the processing of the Amendment did not qualify as excusable error that would permit validation of the Amendment, and it also did not constitute such "error, irregularity, or omission which does not affect the substantial rights of the parties," that accordingly could properly be "disregarded" by the court hearing the action. (Code Civ. Proc., § 866.) The Interested Parties were similarly entitled to more specific descriptions of blight before the hearing.

We are supported in this conclusion by the legislative history of the 2006 amendments to the CRL showing, in relevant part, that more stringent definitions and quantifiable factual support for alleged conditions of economic and physical blight are now required, so that interested public members are kept informed of potential redevelopment changes affecting them. (*Glendora, supra*, 185 Cal.App.4th at p. 832; Historical and Statutory Notes, 41 West's Ann. Health & Saf. Code (2010 ed.) foll.

days). (But see *Glendora, supra,* 185 Cal.App.4th at p. 831 [such policy decisions are generally delegated to the Legislature, not the courts].)

§ 33030, p. 451 ["It is the intent of the Legislature, in amending Sections 33030, 33031 . . . , 33352, 33367 . . . of the Health and Safety Code *to restrict the statutory definition of blight and to require better documentation of local officials' findings regarding the conditions of blight.* The legislative purpose of these statutory amendments is to focus public officials' attention and their extraordinary redevelopment powers on properties with physical and economic conditions that are so significantly degraded that they seriously harm the prospects for physical and economic development without the use of redevelopment." (Italics added.)].)[17]

### 2. Defects in Data Provided Under CRL Definitions of Blight

The trial court ruled the administrative record did not contain any substantial "specific, quantifiable evidence about the location and prevalence of the alleged blighting conditions," under the definitions of section 33031, subdivision (a)(1), for physical blight. In reaching these conclusions, the court adopted the approach set forth in *Glendora, supra*, 185 Cal.App.4th at pages 835 through 836, and in *Blue, supra,* 137 Cal.App.4th at page 1147 and pages 1149 through 1150, that the meaning of "significant" remaining blight in an amended project area (as required for the use of redevelopment eminent

---

[17]   Under section 33367, an amendment to the ordinance shall contain, inter alia: "(d) The findings and determinations of the legislative body, which shall be based on clearly articulated and documented evidence, that: [¶] (1) The project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this part. [¶] . . . [¶] (11) The elimination of blight and the redevelopment of the project area could not be reasonably expected to be accomplished by private enterprise acting alone without the aid and assistance of the agency. [¶] . . . [¶] (14) The implementation of the redevelopment plan will improve or alleviate the physical and economic conditions of blight in the project area, as described in the report prepared pursuant to Section 33352."

domain powers under section 33333.2, subdivision (a)(4)), can be gleaned from the basic definitions of blight contained in sections 33030 and 33031. The court also correctly observed that section 33352 now requires substantial evidence of specific quantification of blight conditions. (§ 33333.2, subd. (a)(4).) This was reflected in the 2006 amendments to the CRL, adding to section 33352, subdivision (b), this language: "The description [in required reports on the proposed specific amendment/project] shall contain *specific, quantifiable evidence* that documents both of the following: (1) The physical and economic conditions specified in Section 33031. (2) That the described physical and economic conditions are so prevalent and substantial that, collectively, they seriously harm the entire project area." (Italics added; Stats. 2006, ch. 595, § 7(b), p. 3780.)

In its statement of decision, the court exhaustively analyzed the types of blighting physical conditions set forth in the RTC and administrative record, under section 33031, subdivision (a)(1): "Buildings in which it is unsafe or unhealthy for persons to live or work," and subdivision (a)(2) "[c]onditions that prevent or substantially hinder the viable use or capacity of buildings or lots." The missing RSG/City field surveys were not in the administrative record, and the court criticized the City's overall showing on physical blight, such as duplicative photographic evidence that did not show the claimed serious dilapidation and deterioration of buildings, and that did not show the required nexus between the deterioration conditions and evidence showing that they rendered those buildings unsafe or unhealthy. Consequently, those blight findings were not supported by "tangible proof." (*Glendora, supra,* 185 Cal.App.4th at p. 836.) Indeed, the court found

34

the supporting "evidence" in the RTC for the City's claims of structural obsolescence to be mainly jargon and conclusory statements, which failed to satisfy statutory requirements. (*Riverside, supra,* 65 Cal.App.4th at p. 627.) The City does not adequately respond to those findings, mainly arguing instead that the Brownfields Studies should have been admitted (as next discussed).

In *Blue, supra,* 137 Cal.App.4th at pages 1142 through 1143, the court discussed pre-2006 CRL statutes and interpreted them as not expressly requiring raw data, such as field surveys, to be provided to the public before an amendment hearing is held (§ 33457.1), nor requiring such data to be provided if referenced in the report to the legislative body. (§ 33352.) In that case, the plaintiffs had been able to prepare adequate opposition, even without obtaining the raw data underlying the reports, and no prejudice to the substantial rights of those parties was found. (Code Civ. Proc., § 866.) Our case is different, and the recent amendments to section 33352 undermine this portion of the holding of *Blue* because now, the Legislature has made clear that better documentation of blight conditions is required, and "specific, quantifiable evidence" of prevalent, serious blighting conditions harming the entire project area must now be presented to support such an amendment. This was not done here to meet the amended standards added to section 33352, subdivision (b).

### 3. *Effect of Brownfields Studies Rulings*

As previously stated, the trial court declined to admit trial exhibit No. 501 (2005 Brownfields Studies), as evidence or as part of the administrative record, and it declined to take judicial notice of its contents. However, the trial court allowed the City in its

35

closing argument to discuss the effect of the mentions of the Brownfields Studies in the RTC, in terms of proof of economic blight conditions, and we briefly address those issues. (§ 33031, subd. (b); but see fn. 3, *ante*, regarding our denial of judicial notice of Brownfields Studies on appeal.)

In the briefs on appeal, the parties continue to dispute whether the Brownfields Studies were properly excluded, on either physical or economic blight issues. The City did not show that the studies were part of the 2007 redevelopment decisional process, but argues they could have been considered, since they already existed, and it was possible the hazardous conditions discussed in them regarding the harbor district (10 percent of the project) were relevant. (See *Franklin-McKinley School Dist. v. San Jose* (1991) 234 Cal.App.3d 1599, 1606-1608 [allowing incorporation of a general plan into an administrative record regarding redevelopment plan, because it was the city's underlying general planning document].) However, the trial court denied the City's request to take judicial notice of them, reasoning that the City should be judicially estopped from relying on the studies, because of its previous in limine motions excluding anything from the reverse validation proceedings that was not in the administrative record. The trial court was justified in that discretionary ruling. (See *Blix St. Records Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 47.)

Even if the Brownfields Studies had been considered to be part of the administrative record that supported an economic blight finding, (§ 33031, subd. (b)(2) [(hazardous wastes]), there was no still physical blight finding that was substantially supported by quantifiable data. Also, the studies would not properly be judicially noticed

36

for their truth about blight issues.  (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063.)  We find no error or abuse of discretion in the trial court's decision to exclude the Brownfields Studies from the administrative record, because they would not have added materially to the City's demonstration of blight conditions.

### D.  Analysis:  Cross-Appeal on Economic Blight

To attack the trial court's economic blight "erroneous ruling" (§ 33031, subd. (b)(7)), CYAC says the crime statistics relied on should have been only project-wide, not City-wide, under the language of section 33030, subdivision (b), as interpreted in cases such as *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 555-556.  (Also see § 33352, subd. (b) [referring to blight in the "project area."].)

We need not address this issue, because the issues previously discussed in connection with the City's unsuccessful appeal of the reverse validation order are dispositive.  There was no adequately supported condition of physical blight in the administrative record, and for a valid Amendment, findings on both serious, significant remaining physical and economic blight, burdening the community and necessitating redevelopment, were required.  (§§ 33030, subd. (b); 33333.2, subd. (a)(4).)  There is no need to resolve the additional claims in the cross-appeal.

37

III

*PRA ISSUES*

A.  Introduction

As a separate and independent ground of the judgment, the trial court issued declaratory relief that the City violated PRA statutory standards, when the City did not produce, upon request, some of the raw data that underlay the RTC conclusions and the enactment of the Amendment.  The attorney fees awards against the City are based on private attorney general theories (Code Civ. Proc., § 1021.5) and also a PRA provision (Gov. Code, § 6259, subd. (d)).  There is some unavoidable overlap between these PRA issues and the CRL ruling that we have already discussed (pt. II, *ante*).  Our review of the PRA ruling in favor of CYAC addresses the trial court's decision to issue declaratory relief strictly as it is reflected in the terms of the judgment, not in all of its broadly stated reasoning in the statement of decision.  (*D'Amico*, *supra*, 11 Cal.3d at p. 19; see fn. 8, *ante*.)

The trial court ruled that both types of this underlying raw data constituted public records, (1) the property-by-property field surveys of the Amendment area (held and stored by the City's consultant, RSG, then destroyed), and (2) property-by-property crime data for the three years prior to the PRA request (held by the City's police department's crime analyst, and used by her to prepare the three-year chart that she sent to RSG for inclusion in the RTC; that underlying data was not found when requested).  The court found that the CYAC requests for such material, among 22 or more categories of records, over a period of two or three months, were reasonably clear, but the City had not

38

responded with reasonable searches and was not justified in failing to require that the known custodians of the existing records should produce them. Injunctive relief was denied because there was no prospective problem shown. (Gov. Code, § 6253.1.)

On appeal in these respects, the City protests that it produced numerous documents to CYAC and should not have been faulted for failing to additionally provide the data its consultant discarded or the crime data, which it did not consider to be meaningful to anyone outside its police department. Under Government Code section 6253.1, the City has the duty to respond to requests for disclosure of the information in public records, including assisting the requester in formulating reasonable requests, because of the City's superior knowledge about the contents of its records. The City's duty requires it to communicate the scope of the information requested to the custodians of its records, who may include private retained consultants, but the City need not forward the exact language of a request, which may not have been accurate. (*ACLU, supra,* 202 Cal.App.4th 55, 82-83.) No exact duplication or "parroting" of the precise language of the requests by the agency to its known custodians is required, but the agency is obligated to make reasonable efforts toward clarification and production. (*Id.* at pp. 85-86, fn. 16.)[18] We agree with the trial court's analysis of the record that the evidence demonstrated that the City's efforts fell short of that accepted standard.

---

18    As will be discussed, the statement of decision imposes an overly broad interpretation of the PRA, holding "that a reasonable search requires the agency to: (1) ask the known custodian of records for (2) *the documents requested in the PRA request*." The PRA does not require an agency to convey to the custodian or consultant the identical language of the request.

## B. PRA Law; CRL Context

The PRA defines "public record" as "any writing *containing information relating to the conduct of the public's business* prepared, owned, used, or retained by any state or local agency." (Gov. Code, § 6252, subd. (e); italics added.) "The definition is broad and ' " 'intended to cover every conceivable kind of record that is involved in the governmental process[.]' " ' " (*Coronado Police Officers Assn. v. Carroll* (2003) 106 Cal.App.4th 1001, 1006.) "[A]ll public records are subject to disclosure unless the Legislature has expressly provided to the contrary." (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 346; Gov. Code, § 6253, subd. (a).)

In Government Code section 6254, specific exceptions to the PRA's policy of disclosure are enumerated, and in Government Code section 6255, a "catch-all exception" allows a governmental agency "to withhold a record if it can demonstrate that 'on the facts of a particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record.' " (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 652; italics omitted.) Generally, " 'exemptions are construed narrowly, and the burden is on the public agency to show that the records should not be disclosed.' " (*California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 167 (*California First Amendment Coalition*).)

In *Blue, supra*, 137 Cal.App.4th 1131, similar PRA issues arose in the context of a redevelopment agency reverse validation action. There the court confirmed that PRA requests are a proper method for seeking information about the underlying raw data that were utilized to support an agency's redevelopment decisions. The court also clarified

40

that "the real 'raw data' was not the [field surveys], but rather, the existing conditions at the properties in the project area," which could independently be observed by opponents of a blight designation. (*Id*. at p. 1144.) However, the 2006 amendments to the CRL, section 33352, subdivision (b) now require more "specific, quantifiable evidence" in support of a blight designation than did the court in *Blue*, which was interpreting prior law. (See fn. 1, *ante*.)

In this case, we are presented not with a traditional claim of exemption of records, but rather with a question of the reasonableness of a given set of requests and responses. Under Government Code section 6253, subdivision (b), an agency has the duty to respond to "a request for a copy of records that reasonably describes an identifiable record or records . . . ." Government Code section 6253, subdivision (c) allows the agency to determine whether the request, in whole or in part, seeks copies of disclosable public records in its possession, and then to make them available within 10 days from receipt of the request. Where more time is needed, to the extent reasonably necessary to the proper processing of the particular request, that time limit may be extended by written notice. (*Ibid*.) Government Code section 6253, subdivision (d), provides: "Nothing in this chapter shall be construed to permit an agency to delay or obstruct the inspection or copying of public records." In *CBS, Inc. v. Block, supra*, 42 Cal.3d 646, 652, the court said such statutory exemptions "are permissive, not mandatory. The Act endows the agency with discretionary authority to override the statutory exceptions when a dominating public interest favors disclosure."

41

Government Code section 6253.1, subdivisions (a) and (b) set forth additional requirements encouraging production of records, over those of Government Code section 6253: "(a) When a member of the public requests to inspect a public record or obtain a copy of a public record, the public agency, in order to assist the member of the public make a focused and effective request that *reasonably describes* an identifiable record or records, shall do all of the following, *to the extent reasonable under the circumstances:* *[¶] (1) Assist the member of the public to identify records and information that are responsive to the request or to the purpose of the request, if stated. [¶] (2) Describe the information technology and physical location in which the records exist.* [¶] (3) Provide suggestions for overcoming any practical basis for denying access to the records or information sought. [¶] (b) The requirements of paragraph (1) of subdivision (a) shall be deemed to have been satisfied if the public agency is unable to identify the requested information *after making a reasonable effort to elicit additional clarifying information from the requester that will help identify the record or records.*" (Italics added.) Government Code section 6253.1, subdivision (c) states these requirements are in addition to those of section 6253.

In a case in which an agency has deliberately withheld its public records, Government Code section 6255, subdivision (a) requires it to justify the same "by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."

Here, the trial court did not find there had been any deliberate withholding of public records by the City. Rather, it ruled in connection with its due process holding that there had been City neglect, indifference or inadvertence in conveying the requests to the respective custodians of the records (field surveys and raw crime data). In the PRA context, we inquire into the scope of the searches as they were understood by each side. In *ACLU, supra*, 202 Cal.App.4th 55, 59, the court remarked, "The scope of the search agencies are required . . . to undertake need only be reasonably calculated to locate responsive documents [citation], and it is often not easy to say what is reasonable in the circumstances. The difficulty in this area also arises from the fact that the scope of the search is determined by the scope of the request. Because the requestor may not know what documents or information of interest an agency possesses, he or she may be unable to provide the specificity an agency may require."

In this light, we examine the statutory requirements on a de novo basis, and then evaluate the record for any substantial evidence support for the trial court's conclusions. (*San Diego County Employees Retirement Assn. v. Superior Court* (2011) 196 Cal.App.4th 1228, 1237, 1241-1242 [statutory interpretation issues are questions of law subject to independent review, while the reviewing court accepts as true any trial court findings of the "facts of the particular case," where supported by substantial evidence]; *ACLU, supra*, 202 Cal.App.4th 55, 66 [substantial evidence standard used for trial court factual determinations].)

## C. PRA Requests and City's Responses

### 1. *Background of RTC; Initial Production of Documents*

The RTC stated it had relied on six major sources in the analysis and assessment of different types of blight conditions remaining in the Amendment area, including as relevant here, "the April 2007 field survey by RSG," and "Information from the [City] Police Department." From May through August 2007, CYAC requested many forms of data in its numerous PRA requests to the City, for over 20 categories of documents. Upon receiving the notice to property owners of the June 19, 2007 hearing, CYAC's official Casillas informally and then on May 23 formally requested documents referenced in that notice, including a copy of the City's "blight studies" together with the "negative declaration" report and "CDC's most recent report." In response to CYAC's May 23 request, and others later, the City disclosed more than 1,200 pages of documents.[19]

On June 15, 2007, CYAC sent three separate PRA requests to the City: (1) its fire department (regarding hazardous materials), (2) its building and safety department (regarding building code violations), and (3) its police department (regarding crime rates and "a property-by-property breakdown of crime in the shaded area over the last three years"). Each of these sought "any data provided to [RSG]" or to the agency, and also referred to "the shaded area" of the boundary parcel map sent out with the notice.

---

[19]   CYAC made other PRA requests June 7, June 15 and June 29, but they are not directly involved in this appeal and need not be discussed in detail, except to note that CYAC used a broadsword approach, not the narrowly targeted one that its respondent's brief represents occurred here. The Interested Parties did not participate in the PRA disputes. (See fn. 8, *ante*.)

On July 27, 2007, CYAC's attorneys sent a lengthy status letter to the City discussing a number of the requests already made to the City. Although some responsive materials had been produced, the raw property-by-property survey data prepared by RSG had not been provided and were again requested, along with other documents.

In its ruling, the trial court determined that the City's response to the May 23, June 15 and July 27 requests violated the PRA because the City did not "diligently search for and produce" the requested documents, that were known to exist and that were under the control of its employees or its consultants. For purposes of this appeal, we need not summarize all the PRA requests or responses, but focus upon the requests that are the subject of this appeal, that pertain to the two types of raw data that were not provided, for various reasons.

## 2. *Field Surveys*

RSG's contract with the Commission gave that agency the property rights to the memoranda, reports, maps, etc. prepared by RSG for the project, all of which was to be turned over to the agency upon completion of the project. RSG used software to process data and to convert field studies from raw data into the documents submitted into the record. The field surveys of blight conditions prepared by RSG were referred to in the RTC as part of the methodology used in creating it. RSG used the 2005 field study as a base and added the 2007 data to it, but it could not later determine what data had been added from the 2007 field surveys.

In the June 15 Fire Department and Building Department requests, CYAC sought "any data provided to [RSG]" or to the commission regarding hazardous materials in the

45

City, or code violations. The City and Commission staff started to locate and provide CYAC with some responsive documents. Around July 10-12, a representative of the City Attorney's office asked RSG to hold onto its backup data or field notes. On July 17, 2007, the City's redevelopment manager Patricia Beard (Beard) sent an e-mail to RSG requesting the back-up data. This was done the same day that the Amendment was approved by the City Council. However, the PRA dispute raged on.

On July 27, 2007, CYAC's status letter to the City discussed a number of the requests it had made to the City, including those for the "raw property-by-property survey data that the consultant RSG used to write the 2007 [RTC]." CYAC's attorney stated that such field surveys of blight conditions had not been supplied.

On August 9, 2007, Beard sent another e-mail to RSG, requesting everything in RSG's files from the 2005 and 2007 Amendments. This request was copied to Frank Spevacek, president of RSG. He testified that only general requests were made to RSG for their files, and he did not understand this request to include any property-by-property field surveys. Beard followed up on CYAC's request by asking her administrative assistant to call RSG's staffer Walter Lauderdale, but it is not clear whether this was done. Nothing further was received from RSG. Their field surveys were later discarded, possibly between June or July of 2007 and May 2008.

### 3. Crime Data

In the RTC, the City referred to a "Table B-3" of crime statistics from 2006, showing the City's crime rates were higher than those of surrounding communities for certain offenses and further, a disproportionate share of the City's crime occurs within the

46

boundaries of the Amendment area. However, the table referred to does not appear in the RTC copies in the record. It was created from a chart of three years of crime data, dated May 8, 2007, "Part 1 Crime Statistics" in the target redevelopment area and City-wide, as provided by the City's police department crime analyst (the three-year chart). The three-year chart was admitted at trial as exhibit No. 14.

In the June 15 police department PRA request, CYAC requested four categories of information: "any data provided to [RSG]" or to the Commission in the last year regarding crime rates in the City. Next, by using the May 2007 notice copy of the boundary parcel map, it sought: "(2) Any data on the rate of crime *in the shaded area on the map* (map provided). (3) A property-by-property breakdown of crime *in the shaded area* over the last three years. (4) Numbers of parking and traffic violations issued *in the shaded area* over the last three years." (Italics added.)

The City's assistant city attorney responded on June 21, 2007, as follows: "You have requested documents from us in a manner that is vague and ambiguous as to what documents are inclusive to your request. For example, I am unclear as to the address of the documents requested via a *'shaded area'* in your attachment. I cannot ascertain the addresses in such shaded areas by inspection of the map you have attached. As such, I need clarification as to the category of items 2-4 as to the exact addresses intended. . . . Item 1 also refers to crime rates. If such crime statistics have not been created by the Department, the City is not required by law to create them for a Public Records Request. If they exist, you are, however, entitled to inspect them." (Italics added.)

47

On June 29, 2007, CYAC answered: "Regarding Request Number 2, that request is based on the statement in the [RTC] that the Police Department gave an estimate of the crime rate in that area. I do not know in what form the Police Department may have provided the information, *but I would like to receive it in whatever form it was provided.* [¶] Regarding Requests Numbers 3 and 4, unfortunately, I do not have the addresses. *If you are able to locate the responsive documents to Request Numbers 1 and/or 2, that would hopefully encompass the responses to Requests 3 and 4.* Also, although I do not have the number addresses, the addresses certainly include any address on National City Boulevard, any address on Civic Center Drive, [etc.]." (Italics added.)

On July 17, 2007, Beard e-mailed two RSG staffers, Lauderdale and Zachary Mikelson, to request back-up data for the "crime table" information mentioned in the RTC. On July 18, 2007, Beard was told by RSG staffer Mikelson that he received the three-year chart (crime statistics) from crime analyst Molli Knobbe (Knobbe) of the police department. She had used raw crime statistics to create the three-year chart, and RSG received and used it to create its table of 2006 crime statistics for the project area, which underlay its RTC conclusions.

On July 19, 2007, the City Attorney's office requested that Knobbe provide it with "any of the data you provided below to this company [RSG]." Knobbe forwarded to the City Attorney the information (the three-year chart) she had provided to RSG on May 8, 2007. When asked if she had provided any other information to RSG, Knobbe replied, "That was it."

48

On July 24, 2007, the City Attorney's office forwarded Knobbe's crime data information to CYAC, including the three-year chart containing crime statistics in the target redevelopment area and City-wide, as well as a list of properties by parcel number.

On July 27, 2007, CYAC's attorneys sent a letter to the City discussing a number of the requests made to the City, including those to the City's police department, and informed the City that it had satisfied the June 15, 2007 requests 1 and 2 to the police department (crime rates in City and shaded map area), *but it had not produced anything in response to requests 3 and 4 (property-by-property breakdown of crime in the shaded area over the last three years, and parking/traffic violations).*

On August 9, 22 and 27, 2007, the City supplied three more sets of documents to CYAC for inspection. On September 25, 2007, CYAC filed its lawsuit claiming in the seventh cause of action that the City had failed to provide responsive documents.

*4. Additional Trial Evidence*

Regarding the field surveys, the president of RSG, Spevacek, testified they had remained in its possession for a time, but were not made part of the RTC. Accordingly, RSG started to discard them when the project closed out in July 2007, and in 2008, RSG completed its office cleanup by purging its paper and physical data after the information was entered into the computer and the computer program updated. He did not recall receiving any request for "everything in your files." RSG did not believe it needed to ascertain if it could provide that 2007 raw data.

At trial, Knobbe testified that the three-year chart she prepared included crime statistics of particular offenses, not crime rates. Crime rates were prepared City-wide

49

twice a year. Once she sent off the three-year chart as requested, she would not normally have sent to the City Attorney any backup data she had used to create the three-year chart, because she did not think anyone else could make sense of it. However, she still had that backup data in her file cabinet in August 2007, and could have sent it if anyone asked for it.

      D. Special Considerations: Possession and Control of Public Records

Generally, public records must be described clearly enough to permit the agency to determine whether the writings or information of the type described in the request are under its control. (*California First Amendment Coalition, supra*, 67 Cal.App.4th 159, 165-166.) "However, the requirement of clarity must be tempered by the reality that a requester, having no access to agency files, may be unable to precisely identify the documents sought. Thus, writings may be described by their content. The agency must then determine whether it has such writings under its control and the applicability of any exemption. An agency is thus obliged to search for records based on criteria set forth in the search request." (*Ibid.*)

"Records requests, however, inevitably impose some burden on government agencies. An agency is obliged to comply so long as the record can be located with reasonable effort." (*California First Amendment Coalition, supra*, 67 Cal.App.4th 159, 166.) An agency may legitimately raise an objection that a request is overbroad or unduly burdensome. (*Ibid.*) However, the courts need not take literally a request's language to deem it clearly excessive, but instead should construe the request reasonably,

50

in light of its clear purposes:  "Feigned confusion based on a literal interpretation of the request is not grounds for denial."  (*Id.* at pp. 166-167.)

Certainly, there was confusion here, some genuine and perhaps some that was feigned.  The City is not claiming that the requested information was exempt from disclosure, but instead that it could not reasonably have been expected to locate it or produce it, either because the requests were confusing, its consultant was to blame, or the crime data was incomprehensible.  The effect of the City's inability or unwillingness to locate the records had the same effect as withholding requested information from the public.  (*ACLU, supra*, 202 Cal.App.4th 55, 85.)  "[I]f an agency's claim that information is beyond *the scope of the request* can be sustained without the detailed justification necessary to sustain a claim that information is exempt or not segregable, agencies could use such claims to relieve themselves of the need to provide the 'detailed justification' ordinarily required to withhold information."  (*Ibid.*)  The focus should be on the criteria in the request and the description of the information, as reasonably construed, and the search should be broad enough to account for the problem that the requester may not know what documents or information of interest an agency possesses.  Without certain knowledge of the nature of the documents, the requester may be unable to provide the specificity an agency may require.  (*Ibid.*)

In construing a disclosure request, the policy of the PRA requires the courts to consider the information that is being requested, not only the precise type of records that must be provided.  (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1072 (*Haynie*).)  For example, an agency may be required to produce the "substance" of complaints and

51

the " 'factual circumstances surrounding the crime or incident,' " even if a requested arrest record is exempt from disclosure.  In enacting exemption provisions, "the Legislature 'required the disclosure of information derived from the records while, in most cases, preserving the exemption for the records themselves.' "  (*Ibid*.; italics omitted.)

"It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden.  [Citations.]"  (*Valencia-Lucena v. U.S. Coast Guard* (D.C. Cir. 1999) 180 F.3d 321, 327; compare *Iturralde v. Comptroller of Currency* (D.C. Cir. 2003) 315 F.3d 311, 315 (*Iturralde*) ["[I]t is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate.  [Citations.]  Rather, the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.  [Citation.]  After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them."].)[20]

In *ACLU, supra*, 202 Cal.App.4th 55, the court relied on FOIA legal standards as persuasive:  " '[W]hether the requestor has been specific enough so that a professional employee of the agency, familiar with the general subject area, could reasonably be expected to find the desired documents.' "  (*Id.* at p. 85, fn. 16; see *Sierra Club v.*

---

[20]   In *Citizens Commission on Human Rights v. FDA* (9th Cir. 1995) 45 F.3d 1325, 1327, an agency's search for requested documents was considered to be reasonable, even though it was unable to produce all of the requested documents, because of the complexity of the 1,000-volume file that had to be searched, having an index of 482 pages, and referring to over 300,000 pages of undisclosed documents, some of which were privileged.

*Superior Court* (2013) 57 Cal. 4th 157 [Supreme Court decided that a PRA statutory exemption for "computer software" in § 6254.9, subd. (a) (a term which included computer mapping systems under § 6254.9, subd. (b)), did not also apply to the mapping database in a certain file format; the underlying database material had to be disclosed, while the computer software required to manipulate the database remained properly exempt from disclosure].)

In *Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 709 (*Consolidated Irrigation Dist.*), the appellate court addressed the issue of whether, under the PRA, " 'the files of consultants retained to prepare an EIR for the City are "public records" that the City has a duty to seek [and] obtain to respond to a public records request.' "  In that case, there were two levels of consultants whose files were sought, the primary consultant and the subconsultants.  The court was not required to address any issue concerning the primary consultant's files( those issues were moot due to access granted).  With respect to the subconsultants' files, the court looked to the nature of the contractual relationship between the public entity and the subconsultants, to decide the PRA issues of (1) whether the files of the subconsultants were " 'in the [actual or constructive] possession of the agency' for purposes of Government Code section 6253, subdivision (c)"; and (2) the nature of the agency's right, if any, to control the files and records of the subconsultants.  (*Consolidated Irrigation Dist., supra,* at p. 710.)

In *Consolidated Irrigation Dist.*, the record substantially supported a finding that the agency lacked control over the subconsultants' records.  The operative contract stated the primary consultant, Land Use Associates, was an independent contractor, and there

53

was an implied finding that the City agency did not control the subconsultants or their files, and could not be required to produce them. (*Consolidated Irrigation Dist., supra,* 205 Cal.App.4th at p. 711.) The case is distinguishable on its facts, but it indicates that the contractual relationship of a public agency and its private consultant is important in determining the agency's duty of disclosure.[21]

E. Extent of City's PRA Obligations to Communicate with Custodians

In its related federal due process findings, the trial court said the City had failed to respond promptly to PRA requests for crime data and property survey information, and it unjustifiably claimed the survey data were not public records, and it had failed to secure that information during litigation to prevent it from being destroyed. (See pt. IV, *post.*) We next examine those factual conclusions, but in the PRA context.

Under Government Code section 6253.1, the City had the duty to assist a requester such as CYAC to formulate reasonable requests and to respond accordingly, by communicating the scope of the public information requested to the custodians of its records. Reasonableness goes both ways, and we disagree with CYAC that only a very few of its requests need be evaluated: July 27 regarding field survey data, and June 15 and July 27 with regard to crime data. The facts are otherwise, because the May 23 request included "all blight studies" and the June 15 requests included not only crime data, but also all materials provided to RSG regarding hazardous materials and building

---

[21]    With reference to its fees motion, CYAC claims the case before us represents the first California PRA trial court ruling about a third party consultant's custody of public records, and the PRA obligation to disclose such records.

54

code violations (physical blight). Even if the precise "field survey" term did not appear in the requests until July 27, it had become clear after the May 23 request that CYAC was seeking information backing up the field surveys, as they had been referred to in the RTC as source material. CYAC cannot now claim that its July 27 request was the only operative one and the others were irrelevant, since the July 27 request clarified the earlier ones. (See *Galbiso v. Orosi Public Utility Dist.* (2008) 167 Cal.App.4th 1063, 1088 (*Galbiso*) ["[A] person who seeks public records must present a reasonably focused and specific request, so that the public agency will have an opportunity to promptly identify and locate such records and to determine whether any exemption to disclosure applies."].)

The record also shows that the trial court previously denied CYAC's motion for sanctions for alleged spoliation of such "critical evidence." The court found no evidence from which it could reasonably infer intentional or willful conduct by City agents or employees that was directed toward destroying either the raw data used by the consultant (field surveys) or any data compiled by the City police department (crime statistics). Accordingly, the whole picture should be examined: Were these public records or information about the people's business, when were they reasonably identifiable, and when were they in the possession or constructive possession of the City? (Gov. Code, §§ 6252, subd. (e); 6253, subd. (c).) The rules of review for statutory interpretation issues apply to questions of law (independent review), but we should accept as true any trial court findings of the "facts of the particular case," if supported by substantial evidence. (*ACLU, supra*, 202 Cal.App.4th 55, 66.)

55

## 1. *Records of Consultant RSG*

The court correctly concluded these were public records within the meaning of Government Code section 6252, subdivision (e), concerning the people's business. Although CYAC originally designated its requests as seeking "blight studies," that was not an unreasonable approach in light of the original language of the RTC. It was not enough for the City to respond that the RTC "was" the blight study. The City then appropriately took further action by contacting RSG in an attempt to obtain the underlying data, the field surveys.

Based on the contractual language between RSG and the City's Commission, the City had an ownership interest in the field survey material and it had the right to possess and control it, even though it did not enforce its contractual right. We agree with the trial court that the City did not act reasonably in protecting its contractual rights to retain this material, even if its staff did not intentionally conceal the data. No bad faith finding was required to support the finding there was a PRA violation. (*Iturralde, supra,* 315 F.3d at p. 315.) When the City staff requested that RSG produce all of its files, but without defining the material actually being sought, it failed to take into account that "field surveys" are a term of art in the redevelopment context. (See *Blue, supra*, 137 Cal.App.4th at pp. 1140-1142.) The City gave up too soon and did not press the matter sufficiently, to a reasonable extent, at a time when most of the field surveys, which it owned, still existed.

We are mindful of the press of business of public agencies, particularly in these difficult fiscal times, and do not hold the City to an impossible standard, merely a

reasonable one. The City is not justified in arguing that it did everything it could or should have to do, nor that all the fault lay with its contractor RSG. Moreover, since 2008 (after the requests in this case were made), Government Code section 6253.3 has provided that a public agency "may not allow another party to control the disclosure of information that is otherwise subject to disclosure pursuant to this chapter," showing the trend in the law is toward promoting such disclosure. (See fn. 21, *ante*.)

Notwithstanding the above, the trial court's reasoning or implied ruling that the City had the statutory obligation to forward the PRA request it received, verbatim, to its consultant as a custodian of public records, is not justifiable as an interpretation of this statutory scheme. Instead, the City had the obligation to interpret the request as received, as made by a member of the public that was presumably not familiar with the underlying data, and then to make reasonable efforts to facilitate the location and release of the information. The trial court's declaratory relief that there had been violations of the PRA was justified, but we decline to issue a rule that PRA requests must be passed on exactly as received to the custodians of public records, even those who are private consultants.

## 2. *Records of City's Police Department*

The record shows that the property-by-property crime reports, requested by CYAC as of June 15, were existing crime data located at the City's police department's crime analyst's office, that were supplied to the City's consultant RSG on May 8, 2007 as transformed into the three-year chart. However, the RSG-created crime table was apparently omitted from the RTC, and the backup crime data was not transferred to the City attorney's office upon request, since the individual crime analyst did not understand

57

the request to include it.  Since the RTC had stated that police records were among the source material relied upon, CYAC had a legitimate basis to request that information.

In response, the City Attorney's office first claimed that it was unclear about what map was being used to identify the information sought, even though only one map had yet been made available (the boundary parcel map; this may have been a stalling tactic). In any case, the City's attorneys eventually sought clarification of the requests, and received the June 29, 2007 response by CYAC that a response to requests 1 and 2 would probably suffice as a response to requests 3 and 4.  Next, CYAC's July 27, 2007 letter stating the City had satisfied requests 1 and 2, but requests 3 and 4 were still outstanding.

As of that time, the City's attorneys were already in possession, or should reasonably have been in possession, of knowledge that its own crime analyst Knobbe had used the underlying crime data to create the three-year chart she sent to RSG, and which RSG used to create a table of crime as referred to in the RTC, to serve as a basis for the RTC's conclusions.  When the City Attorney's office requested that Knobbe provide it with "any of the data you provided below to this company [RSG]," it mistakenly accepted the same information (three-year chart) she had already provided to RSG on May 8, 2007, and also apparently accepted her interpretation that the data would not have made sense to anyone else.  The City could have asked her what raw statistical information underlay the three-year chart or the table, but it did not, and we have no adequate basis to say the data was in fact unintelligible.  (See *ACLU*, *supra*, 202 Cal.App.4th at p. 86, fn. 17 [public data should be produced if possible, even if the court wonders why anyone would want it].)

58

Even without any bad faith showing, the record discloses that the City did not ask the right questions, even though it presumably had the ability to do so. In the course of its normal PRA response procedure, the City's responding attorneys had actual or constructive knowledge of both the information relevant to the redevelopment proceedings, and the police department's type of data, and how they could have been related. To comply with its existing obligations under Government Code section 6253.1, the City staff would not have been required to create a new set of public records nor to take other action that would have exceeded the duties imposed by the PRA. (*Haynie, supra,* 26 Cal.4th at p. 1072.) This is not a case in which multiple governmental departments and agencies are involved in an exceedingly complex fact pattern, in which an extensive search may be deemed reasonable, even where it did not produce the desired results. In such distinguishable cases, requiring additional work over the efforts made by the public agency would unfairly place an undue burden on it. (See *Citizens Comm. on Human Rights, supra*, 45 F.3d at p. 1327.)

Even though the City was not found to be intentionally obstructionist, neither was it sufficiently proactive or diligent in making a reasonable effort to identify and locate the raw crime data. The trial court was justified in concluding the City failed to meet its disclosure duties under the PRA. However, the trial court's ruling imposed more than a statutory obligation on the City, by ruling or implying that the City had the obligation to forward the same PRA request language to its custodian of records, the police department staff. Instead, the City had the obligation to interpret the request, as made by a member of the public that was not presumably as familiar with the underlying data, and to

59

facilitate a reasonable effort to locate and release the information.  (Gov. Code, § 6253.1.)

The declaratory relief finding that there had been violations of the PRA was justified, but we decline to endorse or establish any rule that PRA requests must be passed on verbatim to the custodians of records, whether they are public employees or private consultants.

IV

*FEDERAL PROCEDURAL DUE PROCESS RULING*

A.  Applicable Guidelines

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (*Mathews, supra*, 424 U.S. 319, 333.) There the Supreme Court said, " ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' [Citation.]  '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'  [Citation.]  Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." (*Id*. at pp. 334-335 [statement preceding the three-part test elements].)

"[T]he Due Process Clause provides that certain substantive rights--life, liberty, and property--cannot be deprived except pursuant to constitutionally adequate procedures.  The categories of substance and procedure are distinct.  Were the rule otherwise, the Clause would be reduced to a mere tautology.  'Property' cannot be defined

60

by the procedures provided for its deprivation any more than can life or liberty."
(*Cleveland Bd. of Educ. v. Loudermill* (1985) 470 U.S. 532, 541-542 [holding the federal due process clause requires a dismissed employee to receive a pretermination opportunity to respond to charges at a meaningful time; however, mere allegation that nine months was too long to wait to respond failed to state another separate claim for constitutional deprivation of process].)  Once it is determined that the due process clause applies, federal standards, not state standards, govern the decision on what process is due.  (*Id.* at p. 541.)

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit':  'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.' "  (*Town of Castle Rock v. Gonzales* (2005) 545 U.S. 748, 756 (*Castle Rock*).)  "Such entitlements are, ' "of course, . . . not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." ' "  (*Ibid.*)

In *Castle Rock*, as here, "the ultimate issue" was whether state law gave to the plaintiff a protectable property interest, for purposes of Fourteenth Amendment remedies.  "That determination, despite its state-law underpinnings, is ultimately one of federal constitutional law.  'Although the underlying substantive interest is created by "an independent source such as state law," federal constitutional law determines whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due

61

Process Clause.' [Citations.] Resolution of the federal issue begins, however, with a determination of what it is that state law provides." (*Castle Rock*, *supra*, 545 U.S. 748, 756-757; italics omitted.) There, the court also expressed and explained "our continuing reluctance to treat the Fourteenth Amendment as ' "a font of tort law" ' " (*id.* at p. 768), while recognizing that the states have the power to provide plaintiff-victims with personally enforceable remedies. (*Id.* at pp. 765-768 [but noting there was no existing statutory right of a "protected person" to enforce a domestic violence restraining order].)

In *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152 (*Clark*), the court explained that a violation of state administrative hearing protections does not always give rise to liability under the federal Constitution: "Obviously, this is not the first time a plaintiff has attempted to convert a state law claim into a federal case of constitutional proportions. [Citation.] However, we conclude that while the City violated state law by failing to provide a fair hearing, it did not offend the federal Constitution, on either procedural or substantive due process grounds." (*Id*. at p. 1178.) Thus, a "state law requirement that a public entity conduct hearings in a fair manner does not automatically implicate the federal due process clause. . . . [B]efore reaching any question about the fairness of a particular proceeding under the federal Constitution, we must first address whether a protected interest--life, liberty, or property--is implicated. If no such interest is involved, then the procedural protections of the due process clause do not come into play." (*Ibid.*, citing *Board of Regents v. Roth* (1972) 408 U.S. 564, 569-578.)

## B. Issues Now Presented

As already explained, the trial court ruled the City had violated "CYAC's right to procedural due process under the Fourteenth Amendment with respect to its failure to timely provide the maps with the RTC, *which were required by statute*." (Italics added.) The court also referred to the lack of "other blight condition information" in the RTC. In a related ruling, the court concluded that "at a minimum, a continuance of the public hearing upon request was required."

However, since the City had met all the basic notice requirements of section 33452, and CYAC had been given notice by late April-early May of the June 19, 2007 hearing on the Amendment, the court ruled that CYAC had "sufficient time to undertake its own investigation to present evidence to the City Council."[22] Thus, the court declined to issue a broader procedural due process ruling that would have imposed any additional specific time requirements on the City to make the RTC available to the public, "prior to the public hearing," such as by impliedly adding to the language of section 33457.1. (*Blue, supra,* 137 Cal.App.4th 1131, 1142-1144.)[23] Since CYAC had been able to prepare and present extensive opposition, the court restricted its ruling to a finding that CYAC was not afforded the requisite due process with respect to the failure

---

[22] The RTC and agenda items were made available three business days before the public hearing, pursuant to the standards of the Brown Act. (Gov. Code, § 54954.2, subd. (a).)

[23] CYAC seeks imposition of a rule for 60-90 days' mandatory notice under the PRL. This would in effect require this court to act as a legislative body making policy decisions, and we shall reject that claim *post*. (*Glendora, supra*, 185 Cal.App.4th at p. 831.)

63

to timely provide the maps and other statutorily required blight condition information with the RTC.  (§ 33352, subd. (b).)

In its earlier denial of summary adjudication to the City of the CYAC constitutional claims, the court had identified remaining factual issues about whether, on this record, the statutory requirements satisfy due process requirements.  Later at trial, the court heard expert testimony from CYAC's land use consultants about their estimates of the time it would take to prepare adequate responses to the RTC, as well as other testimony about the nature of CYAC's property interest within the proposed Amendment area.

To examine this ruling, we emphasize that CYAC did not plead and prove these were substantive due process violations, such as arbitrary and irrational governmental decision-making.  (*Clark*, *supra*, 48 Cal.App.4th 1152, 1183.)[24]  The trial court explained that the arguments being made by CYAC possibly included a facial challenge or an as applied challenge to the terms of section 33457.1, which required provision of the RTC to the legislative body and the public "prior to" the hearing.[25]  As noted,

---

[24]    For illustration, compare *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 845 stating "[s]ubstantive due process protects against arbitrary government action"; *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1032 (substantive due process violation requires some form of outrageous or egregious conduct constituting "a true abuse of power").

[25]    " 'A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.  [Citation.]  " 'To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . . Rather, petitioners must

however, the court rejected any such facial or as applied challenge, which it considered to be broader than the essential procedural due process claim before it, related to the lack of the timely provision of statutorily required maps and "other blight condition information." (§ 33352, subd. (b).)

Accordingly, we are required to address a fairly narrow ruling by the trial court, which found that each element of the test set forth in *Mathews, supra*, 424 U.S. 319, was violated here, due to the lack of timely provision of maps or "other blight condition information." Identification and balancing of the competing interests at stake are required to determine if this procedural scheme for the protection of CYAC's property interest was adequate to ensure a meaningful hearing that met minimum overall standards of fairness in this particular context. (*California Teachers Assn. v. State of California, supra*, 20 Cal.4th 327, 347-348.)

C. Application of Legal Principles: Type of Protectable Property Interest

CYAC chiefly argues that if it had failed to follow its remedies under section 33500, to promptly pursue a cause of action for reverse validation of the Amendment, its property interests would have been immediately harmed by the blight designation.[26] It

---

demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " [Citations.]' " (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 338.)

[26] Section 33500 now provides: "(a) Notwithstanding any other provision of law, including Section 33501, an action may be brought to review the validity of the adoption or amendment of a redevelopment plan at any time within 90 days after the date of the adoption of the ordinance adopting or amending the plan, if the adoption of the ordinance

65

claims that under section 33368, an unchallenged decision of the City would have been final and conclusive, allowing a conclusive presumption that the project area is a blighted area as defined by section 33031. However, the reverse validation ruling prevented this section 33368 presumption from going into effect to allow any later land acquisition based on blight. (§ 33391.)

More generally, CYAC seems to argue its ownership of property in the Amendment area should give it a protected, heightened interest in participating in an amendment procedure that is in strict compliance with the CRL, in which the City would guarantee the public received only a timely and complete RTC. (§ 33457.1.) We must consider the nature of CYAC's private property interest to be affected by the enacted Amendment, and "the precise nature of the government function involved." (*Cafeteria & Restaurant Workers Union v. McElroy* (1961) 367 U.S. 886, 895.) As we will show, even in light of the statutory limitations period of only 90 days to challenge the blight designation, the record did not show that as a matter of law, an imminent blight designation was so harmful or personalized to CYAC's property interests as to invoke federal procedural due process protections that would go beyond state law. (§§ 33500 or 33501.)

*1. Redevelopment Law and Blight Designation*

Generally, a land use application invokes procedural due process protections only if the owner has a legitimate claim of entitlement to the approval. (*Breneric Associates v.*

occurred prior to January 1, 2011." Subdivision (b) is similar on agency findings. The Validation Act applies to such an action. (§ 33501; Code Civ. Proc., § 860 et seq.)

66

*City of Del Mar* (1998) 69 Cal.App.4th 166, 181-184.) "An ownership interest alone does not cloak the prospect of developing the property with the protections of procedural due process." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 853 (*Las Lomas Land*).)

In *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 614-615 (*Horn*), it was held that procedural due process protections apply to adjoining property owners, if their property interests are substantially affected by adjudicatory land use decisions on an adjacent property. However, "*Horn* does not support the proposition that the denial of a development application constitutes a deprivation of property for purposes of procedural due process." (*Las Lomas Land*, *supra*, 177 Cal.App.4th 837, 853-854.) Constitutional notice and hearing requirements are triggered by governmental action that will result in significant or substantial deprivations of property, and this category does not include an agency decision having only a de minimis effect on land. (*Horn, supra,* at p. 616; *Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 963 (*Robinson*).)

In the context of redevelopment law, the eminent domain power was only one of the avenues that the City's (former) redevelopment agency could take in fighting urban blight. (See fn. 11, *ante*.) In *Cambria Spring Co., supra,* 171 Cal.App.3d 1080, the appellate court distinguished between the eminent domain power and an amendment of a redevelopment plan relating to eminent domain. In rejecting a landowner's claim of inverse condemnation damages based on redevelopment decisions, the court noted:

67

"The adoption of a redevelopment plan closely resembles the general planning which . . . has been held not to constitute an announcement of intent to condemn. The adoption of a redevelopment plan goes further than the adoption of a general plan (Gov. Code, § 65300 et seq.). As held in *Selby Realty Company v. City of San Buenaventura* [1973] 10 Cal.3d 110 [(*Selby Realty*)], the adoption of a general plan does not amount to an announcement of intent to condemn, and a general plan is prerequisite to a redevelopment plan [citation]. However, the adoption of a redevelopment plan still falls 'several leagues short of a firm declaration of an intention to condemn property.' (*Selby Realty*[, *supra*], 10 Cal.3d at p. 119.) This is so because the redevelopment plan still does not provide the 'special and direct interference with plaintiff's property' required by *Selby Realty*. [Citation.] Moreover, a redevelopment plan, like a general plan, may be amended [citation] before plaintiff's property is taken. [Citation.] . . . Thus, adoption of a redevelopment plan does not have the finality required to give rise to liability for damages." (*Cambria Spring Co.*, *supra,* at p. 1097.)

In *Cambria Spring Co., supra*, 171 Cal.App.3d at page 1098 the court further concluded, "As there was no official action amounting to an announcement of intent to condemn, there could be no liability based upon unreasonable delay following such an announcement. The evidence was substantial and convincing that [the City's] activities never went beyond the planning stage, and did not reach the 'acquiring stage.' "

In *Card v. Community Redevelopment Agency* (1976) 61 Cal.App.3d 570, 578-579, the reviewing court distinguished between procedural due process protections and substantive due process protections, in the context of redevelopment. There, the agency had failed to follow the correct statutory scheme for amending a redevelopment plan, but had given constitutionally adequate notice and hearing in doing so, and constitutional *procedural* due process of law was not denied. (Accord, *National City Business Assn. v. City of National City* (1983) 146 Cal.App.3d 1060, 1069 [wrong type of agency making

68

the correct decision did not prejudice the landowners].)  Instead, in *Card*, the failure to use the correct procedures served to effectively deny the affected persons *substantive* due process of law, by making them ineligible for certain statutory relocation protections they would have received, had proper redevelopment procedures been followed.  (*Card, supra,* at pp. 580-582.)

In the case before us, the City sought to impose a blight designation on CYAC's property, through the redevelopment amendment, at a time when the City had not initiated any eminent domain action.  Neither had CYAC brought any inverse condemnation action.  (See *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 897 ["[I]nverse condemnation damages for precondemnation conduct must be claimed in a pending eminent domain action" and " '[t]he basic measure of damages in inverse condemnation actions, as in all eminent domain proceedings, is "market value." ' "; see 29 Cal.Jur.3d (2011) Eminent Domain, § 345, p. 457 ["a planning designation is not the functional equivalent of an announced intent to condemn"].)  Section 33390 et seq. outlines the means of acquiring real property for redevelopment purposes.  Under section 33398, an eminent domain statute (Code of Civ. Proc., § 1245.260), that authorizes inverse condemnation claims alleging harm from an undue delay after a resolution of necessity to take, *shall not apply to approvals of redevelopment plans or amendments*. These are different bodies of law.

CYAC nevertheless seems to be importing concepts from the realms of eminent domain (just compensation), or inverse condemnation (precondemnation damages), to assert that from the RTC defects, it suffered such an injury to its protected property

69

interests (whether in value or legal status) that additional procedural due process requirements should have been imposed.[27] However, in this early stage proceeding in the redevelopment context, CYAC cannot show that the enactment of the Amendment creating a potentially unsupported blight designation was so harmful that it resulted in significant or substantial deprivations of its procedural rights to protect its property. (*Horn, supra,* 24 Cal.3d at p. 616; *Robinson*, *supra*, 208 Cal.App.4th 950, 963.)

We acknowledge that a blight designation amendment might potentially have more than a de minimis effect upon a property interest. Here, however, the procedural protections imposed by the CRL statutory scheme, combined with the eminent domain statutory scheme, were constitutionally sufficient state law measures to safeguard the interests of a landowner within a proposed Amendment area. (*Horn, supra,* 24 Cal.3d at p. 616; *Mathews, supra*, 424 U.S. at pp. 334-335.) Under *Cambria Spring Co.*, *supra,* 171 Cal.App.3d 1080, the Amendment to the redevelopment plan did not amount to a " 'special and direct interference with plaintiff's property,' " because it preceded any actual taking of property: "[A]doption of a redevelopment plan does not have the finality required to give rise to liability for damages." (*Id.* at p. 1097.) The same is true of an amendment. Moreover, the lack of adequate supporting data for the Amendment, regarding blight conditions, was already addressed through the 2006 changes in the CRL provisions (§§ 33352, subd. (b); 33457.1), and in the PRA procedures followed.

---

[27] With respect to the value of the CYAC real property, it claims the City was trying to force it to sell to a developer, so it gave it an inflated $1.2 million sales offer to make the developer go away, but CYAC does not claim the property is worth that much. The City denies that it was pressuring CYAC.

In considering "the precise nature of the government function involved," and the nature of CYAC's interest in its property (as potentially affected by the public Amendment proceedings), we conclude the CRL statutory protections against an unsupported blight designation were not so inadequate as to require or invoke greater constitutional procedural due process protections. (§§ 33500, 33501, 33368; *Cafeteria & Restaurant Workers Union v. McElroy*, *supra*, 367 U.S. 886, 895.) We next test this conclusion against the cases relied on by CYAC and the trial court in support of the procedural due process finding.

## 2. *Comparison of Cases Cited*

The trial court's ruling relied on *United States v. James Daniel Good Real Property* (1993) 510 U.S. 43, 53-55 (*Good*), to state that "[t]he right of Californians to be secure in their real property constitutes a valid protectable property interest." That case arose in the context of ex parte preseizure proceedings, after Good had pleaded guilty to promoting a harmful drug in violation of Hawaii law. The federal government subsequently declared a forfeiture, seizing his house and land without prior notice or an adversary proceeding, on the ground that the property had been used to commit or facilitate federal drug offenses. (21 U.S.C. § 881(a)(7).) The high court accepted Good's assertion that this ex parte proceeding deprived him of his home and property without due process of law, because the purpose of a due process requirement is " 'not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment--to minimize substantively

71

unfair or mistaken deprivations of property. . . .' [Citation.]" (*Good, supra*, at p. 53.)

Thus:

> "The constitutional limitations we enforce in this case apply to real property in general, not simply to residences. That said, the case before us well illustrates an essential principle: Individual freedom finds tangible expression in property rights. At stake in this and many other forfeiture cases are the security and privacy of the home and those who take shelter within it." (*Good, supra*, 510 U.S. 43, 61.)

Although those principles cannot be disputed, the degree of the invasion of CYAC's commercial property interests by these redevelopment amendment proceedings, through the City's provision of a late and incomplete RTC, is simply not fairly comparable to the magnitude of an ex parte seizure of residential property as a civil forfeiture. (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 ["Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."].)

Here, CYAC's business property was the subject, among 691 other parcels, of CRL notice and hearing procedures for the amendment of the redevelopment plan, and CYAC had the opportunity to present opposition and to seek additional data for preparing further opposition. CYAC cannot persuasively now argue that it had a general "interest in protecting its real property" that should have precluded the City from pursuing its statutorily controlled, noticed redevelopment procedures, or punished the City for doing so defectively, in light of otherwise available state remedies under the CRL. Nor can we give any particular policy weight to CYAC's commendable use of its property to serve the youthful public.

72

CYAC places great reliance on the case of *Brody v. Village of Port Chester* (2d Cir. 2005) 434 F.3d 121 (*Brody*), in which a condemnee sued the Village as condemnor, alleging it had violated his federal procedural due process rights, by failing to provide him with adequate notice of his statutory right to challenge its public use determination (as well as the procedures to implement the right). State law provided him with an opportunity for a predeprivation review hearing, before the title acquisition process was concluded. The court held in the eminent domain context that due process requires the condemnor to give as much notice as is practicable in attempting to inform an affected property owner of a proceeding that threatens to deprive the owner of that property interest, and such "reasonable notice" must include mention of the commencement of the statutory 30-day challenge period. However, no notice of the implementing procedures was constitutionally required. This case is distinguishable, as farther along in the condemnation process, with a greater taking at stake.

In *Brody,* the court referred to the principle in *Kelo v. City of New London* (2005) 545 U.S. 469, that " '[f]or more than a century, [the Supreme Court's] public use jurisprudence has widely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power.' " (*Brody, supra*, 434 F.3d at p. 134.) Although the court in *Brody* set aside an order allowing the condemnation to proceed, it also noted that the state law review procedure was appropriate "given the narrow role that the courts play in ensuring that the condemnation is for a public use." (*Ibid.*) It thus ruled that "from a constitutional perspective, *Brody has no constitutional right to participate in the Village's*

73

*initial decision to exercise its power of eminent domain*, and the post-determination review procedure set forth in [N.Y. law] is sufficient under the test articulated by *Mathews, [supra]*, 424 U.S. 319, 335 []. Due process does not require New York to furnish a procedure to challenge public use beyond that which it already provides." (*Brody, supra*, at p. 133; italics added.)

Here too, the CRL statutory scheme allowed the City and its Commission to pursue the Amendment to authorize a public use determination, and thus to enable some future exercise of the eminent domain power, by following the prescribed procedures, and it further provided for reverse validation challenges. (See *National City Business Assn. v. City of National City, supra*, 146 Cal.App.3d 1060, 1065 [federal and state constitutions "guarantee the right to not have one's property taken without just compensation; there is no *fundamental* right to not have one's property taken *at all*;" original italics.) As we have found previously in this opinion, the City did not pursue the Amendment entirely properly, and CYAC was entitled to the remedy of reverse validation, as well as a declaration that the PRA procedures had not been followed. That relief was comprehensive in nature and sufficiently vindicated the actual, existing interests that CYAC, as well as other interested parties, had at stake in successfully resisting the blight designation.

A "state law requirement that a public entity conduct hearings in a fair manner does not automatically implicate the federal due process clause." (*Clark, supra*, 48 Cal.App.4th 1152, 1178.) CYAC did not show any separate and additional, cognizable procedural due process deprivation that occurred due to these statutory duty violations,

which all took place before any "taking" was actually initiated.  Here, as in *Cambria Spring Co.,* "Under the facts of this case, the Constitution does not require that [CYAC] be given relief beyond that provided by the statute." (*Cambria Spring Co., supra*, 171 Cal.App.3d at p. 1099.)

D.  Risk of Erroneous Deprivation of Rights; Burden on Public Entity

"[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." (*Mathews, supra,* 424 U.S. 319, 344-345.)  At trial, the court heard expert opinion testimony about how much more time the opponents of the Amendment should have been given to fight this redevelopment blight designation.  The court's ruling acknowledged that CYAC had nevertheless been given adequate notice of the public hearing and had had an opportunity to prepare opposition.

The trial court correctly declined to issue any ruling adding to the statutory requirements of section 33457.1, that the RTC and related information of blight conditions must be given "prior to the hearing."  The Legislature did not designate any time frame for how far in advance that disclosure should be made, and it was not required to do so; we leave such policy decisions to the Legislature. (*Glendora, supra,* 185 Cal.App.4th at p. 831.)

Further, we need not weigh in upon whether the City should have granted a continuance of the public hearing for purposes of allowing further opposition to be filed.  The City took six volumes and more of posthearing written opposition, as shown in the administrative record.  The record also shows that the City was under some self-imposed

75

time pressure because the previous ordinance allowing the exercise of the eminent domain power was about to expire, but the City had not noticed the hearing earlier because the November 2006 election ballot had created some uncertainty, due to a measure on it about redevelopment. In any case, and especially since the reverse validation order was properly granted, this record does not show there was a serious risk of erroneous deprivation of rights of property owners within the Amendment area, that would have justified imposing additional federal procedural due process protections or sanctions.

In view of the recent abolition of redevelopment agencies, and for all of the above reasons, it would serve no purpose for this court to additionally examine the portions of the *Mathews* test that address the "probable value, if any, of additional or substitute procedural safeguards" and the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews, supra,* 424 U.S. at p. 335.)

We conclude that CYAC's asserted interest in property protection against any potentially unsupported blight designation, by receiving strict CRL compliance, is not a protectable property interest for procedural due process purposes. There is no federal constitutional law principle currently establishing that such a claimed interest " 'rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.' " (*Castle Rock, supra*, 545 U.S. 748, 756-757.) The declaratory relief and nominal damages order and judgment on CYAC's claim of federal procedural due process deprivations must be reversed.

76

# V

## *ATTORNEY FEES*

After trial, the court ordered the City to pay substantial attorney fees to CYAC ($1,906,516.75) and to the Interested Parties ($84,652.50).  (42 U.S.C. § 1988; Gov. Code, § 6259; Code Civ. Proc., § 1021.5.)  The court made those awards after determining that discretionary relief from late filing of the motions should be granted under Code of Civil Procedure section 473, and then hearing the respective fees motions. (Rule 3.1702.)

Despite the abolition of redevelopment agencies and the overhaul of the CRL that occurred in 2011, the trial court's substantive rulings in the validation context, as well as the PRA claims, continue to serve as the basis for an attorney fees award.  Particularly as to the relief granted to CYAC on the federal due process claim, our reversal of that part of the judgment removes in large part the legal basis for the attorney fees award against the City, insofar as it was based on Title 42 United States Code section 1988.  (*Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1105 [when a judgment is reversed, the fee award based on the judgment falls].)

However, the fees awards to CYAC and the Interested Parties were also based on another provision of law with respect to the validation and CRL relief, Code of Civil Procedure section 1021.5 (private attorney general theory).  CYAC alone received an attorney fee award based on the PRA (Gov. Code, § 6259, subd. (d)), as the court determined that it applied, and that if it did not, Code of Civil Procedure section 1021.5 would fill the gap and allow such fees.

Before we can address the merits of the City's appeal of those fee awards under the PRA (Gov. Code, § 6259, subd. (d)) or Code of Civil Procedure section 1021.5, or the fees cross-appeal by CYAC, we must resolve several procedural problems presented by this record. First, we will discuss the propriety of the discretionary relief granted by the trial court from alleged untimely filing of the fees motions under the provisions of rule 3.1702. (See *Russell v. Trans Pacific Group* (1993) 19 Cal.App.4th 1717, 1728-1729 [even though procedural requirements for obtaining costs are mandatory, trial court retains jurisdiction to grant relief upon proper showing of mistake, inadvertence, surprise or excusable neglect].)

We shall determine that the trial court had jurisdiction to grant relief from any late filing, and did not abuse its discretion in doing so, and accordingly, we proceed to examine the legal basis for the attorney fees awards under both the two remaining statutory theories, the PRA and Code of Civil Procedure section 1021.5. As explained in *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689-690 (*Bell*), Code of Civil Procedure section 1021.5 will not provide an independent basis for an attorney fees award, when there are already existing specific statutory fee provisions that apply, such as Government Code section 6259, subdivision (d). " 'Code of Civil Procedure section 1021.5 was intended to provide specific guidelines for the exercise of inherent judicial power to award fees *not specifically authorized by statute*.' " (*Bell, supra*, at pp. 689-690; italics added.) We address whether the court correctly concluded that fees on CYAC's PRA claim were specifically authorized by the PRA statute.

78

Having given guidance to the trial court in those respects, we shall reverse the orders awarding attorney fees and return those remaining issues to the trial court for its exercise of discretion in evaluating the factors set out in Code of Civil Procedure section 1021.5 (and the PRA, as to CYAC only). This will include both the entitlement issues and an apportionment of any fees awards among the various successful and unsuccessful claims.

## A. Discretionary Relief From "Untimely" Filing

To assess the soundness of the relief allowed from late filing of the fees motions, we outline the terms of rule 3.1702(a). It states, "*Except as otherwise provided by statute*, this rule applies in civil cases to claims for statutory attorney's fees and claims for attorney's fees provided for in a contract. Subdivisions (b) and (c) of rule 3.1702 apply when the court determines entitlement to the fees, the amount of the fees, or both, whether the court makes that determination because the statute or contract refers to 'reasonable' fees, because it requires a determination of the prevailing party, or for other reasons." (Italics added.) Turning to rule 3.1702(b)(1), "A notice of motion to claim attorney's fees for services up to and including the rendition of judgment in the trial court--including attorney's fees on an appeal before the rendition of judgment in the trial court--*must be served and filed within the time for filing a notice of appeal under rules 8.104* and 8.108 in an unlimited civil case . . . ." (Italics added.) At the outset, it seems rule 8.104(a)(1)(B) would therefore apply, stating "Unless a statute or rule 8.108 provides otherwise, a notice of appeal must be filed on or before the earliest of: [¶] (B) *60 days after the party filing the notice of appeal serves or is served by a party with a document*

79

*entitled 'Notice of Entry' of judgment* or a file-stamped copy of the judgment, accompanied by proof of service . . . ."  (Italics added; rule 8.108(a) [would allow an extension of time only in certain cases not present here, e.g., motion for new trial, etc.].)

The text of rule 3.1702(d) clearly allows for "Extensions[:]  For good cause, the trial judge may extend the time for filing a motion for attorney's fees in the absence of a stipulation or for a longer period than allowed by stipulation."

As relevant here, major confusion arose from the parallel terms of Code of Civil Procedure section 870, subdivision (b), the Validation Act appeals deadline: "(b) Notwithstanding any other provision of law including . . . any rule of court, no appeal shall be allowed from any judgment entered pursuant to this chapter *unless a notice of appeal is filed within 30 days after the notice of entry of the judgment*, or, within 30 days after the entry of the judgment if there is no answering party."  (Italics added; see *Planning and Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264, 269, 273-274 ["The legislative history indicates the intent of the amendments to section 870, adding the shortened period, was simply to reduce the period of uncertainty before finality of a validation action . . . .  Moreover, the provision of a longer period for appealing collateral orders would be inconsistent with the legislative purpose of ensuring prompt finality."].)

With reference to rule 3.1702(d), the court in *Lewow v. Surfside III Condominium Owners Assn., Inc.* (2012) 203 Cal.App.4th 128, 135 said the provision allowing a trial judge to extend the time for filing a motion for attorney fees is remedial and should be given a liberal, not a strict interpretation.  While an attorney fees motion should be timely

80

filed, the rule provisions are mandatory but not jurisdictional, and on a proper showing under section 473, the trial court may grant relief for such mistake, inadvertence, surprise, or excusable neglect. (*Russell v. Trans Pacific Group, supra*, 19 Cal.App.4th 1717, 1728-1729.)

In a previous order, we granted in part the City's judicial notice request, to permit additional materials on the attorney fee questions to be considered on appeal. They show the same basic history of the enactment of the predecessor rule (rule 870.2) that was outlined in *Sanabria v. Embrey* (2001) 92 Cal.App.4th 422, 428, as follows. That predecessor rule incorporated other stated time periods for filing a notice of appeal and a fees motion, as shown in Administrative Office of the Courts memoranda. From this history, the appellate court concluded, "It is therefore clear that . . . rule 870.2 provides time limits for motions for attorney fees in all civil cases, and its 60-day time limit commences to run at notice of entry of judgment or dismissal." (*Sanabria*, *supra*, at p. 429.)

From its rulemaking history materials, of which judicial notice has been taken, the City now argues the trial court should not have heard the fees motion of either CYAC or the Interested Parties, because they were not filed according to the 30-day deadline of Code of Civil Procedure section 870, but were filed within 60 days, under the alternative rule provisions. The City claims that there was no excusable neglect, because the portion of rule 3.1702(a) referring to "except as otherwise provided by statute" should have been easily interpreted to apply the 30-day deadline of Code of Civil Procedure section 870.

81

In its October 2011 opposition to the motion for section 473 relief, the City further argued it would be prejudiced if such relief were granted, due to its imminent financial obligations under the recent legislation dissolving all redevelopment agencies and requiring the successor agencies to wind down their operations. The City referred to then-pending litigation about the legislation, which might affect the City's liability for a fee award as a judgment.

In granting relief under Code of Civil Procedure section 473 and rule 3.1702(d), the trial court correctly stated it was empowered to relieve a party from the failure to meet a procedural time limit, upon a proper showing, and that the applications were timely and accompanied by the proposed pleading. The court ruled that CYAC's counsel, and by joinder, counsel for the Interested Parties, had shown there was a reasonable and honest mistake of law in the late filing, so that the fees applications should be heard on their merits. We agree that this was a proper resolution of these inconsistent rules and provisions, and there was no inexcusable neglect by counsel in interpreting them.

To reach this conclusion, we need not answer the precise question posed by the appeal and the cross-appeal, of whether the 30- or 60-day deadline properly applies, but instead, we rule only that the court was justified in granting relief under Code of Civil Procedure section 473 and rule 3.1702(d), and therefore the fees motions were properly heard on their merits. We next turn to the legal foundations of the awards themselves.

B.  PRA, Government Code section 6259, Subdivision (d)
Requirements for Fees Awards

"The [PRA] sets forth specific procedures for seeking a judicial determination of a public agency's obligation to disclose records in the event the agency denies a request by a member of the public."  (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 426 (*Filarsky*).)  Under Government Code section 6258, "[a]ny person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records under this chapter."

Under Government Code section 6259, subdivision (a), "if it appears from the plaintiff's verified petition that 'certain public records are being improperly withheld from a member of the public . . . ,' the court shall order the officer or person charged with withholding the records to disclose the public record or show cause why he or she should not do so.  . . .  'If the Court finds that the public official's decision to refuse disclosure was not justified under Section 6254 or 6255, he or she shall order the public official to make the record public.'  (§ 6259, subd. (b).)"  (*Galbiso, supra,* 167 Cal.App.4th 1063, 1084.)[28]  "[T]he standard test for determining if a plaintiff has prevailed under the Public

---

28     In *Galbiso, supra*, 167 Cal.App.4th 1063, 1089, there were "highly unique circumstances presented" that justified an award of fees.  The public agency had unjustifiably denied the plaintiff any "access to all public records by means of making Galbiso leave the premises if and when she sought to inspect documents, [and] Galbiso's success in the lawsuit was adequately demonstrated by her vindication of her basic right of access under the [PRA, and thus,] Galbiso was a prevailing party entitled to an award of attorney fees under section 6259, subdivision (d) . . . ."  (*Galbiso, supra,* at p. 1089; italics omitted.)

Records Act is whether or not the litigation caused a previously withheld document to be released." (*Id*. at p. 1088.) In the case before us, such remedies were never obtained.

Government Code section 6259, subdivision (d) provides: " 'The court shall award court costs and reasonable attorney fees to the plaintiff should the plaintiff prevail in litigation filed *pursuant to this section*.' " (*Filarsky, supra,* 28 Cal.4th at p. 427; italics added.) If the plaintiff pursued more than one legal theory, apportionment of fees is required by statute.

The case before us is somewhat anomalous in that the subject requested records were never produced, i.e., the lost field survey data and the missing police department property-to-property crime reports from the past three years. The question then arises whether CYAC has actually "prevailed" within the meaning of section 6259, subdivision (d), by suing and causing the agency to release previously withheld documents. (*Belth v. Garamendi* (1991) 232 Cal.App.3d 896, 898 [Gov. Code, § 6259, subd. (d), mandates an award of attorney fees "to a plaintiff who prevails in litigation filed under the [PRA]"].) "An action under the [PRA] results in the release of previously withheld documents if the lawsuit motivated the defendants to produce the documents." (*Rogers v. Superior Court* (1993) 19 Cal.App.4th 469, 482.) Not so here. Accordingly, these observations in *Galbiso, supra*, 167 Cal.App.4th 1063, 1087, are well taken here:

> "[Government Code] Section 6259 expressly applies '[w]henever it is made to appear by verified petition . . . that certain public records are being improperly withheld from a member of the public,' and a judicial determination is necessary to resolve the issue. [Citation.] We believe the language of [Government Code] section 6259 is sufficiently broad to include the present lawsuit. That is, where a means is employed by a public agency to effectively deny access to

84

all public records and a lawsuit is filed to remedy the problem, that lawsuit would constitute a claim that 'certain public records are being improperly withheld from a member of the public' within the scope of section 6259." (Italics omitted.)

Government Code section 6259 should be interpreted in light of "the overall remedial purpose of the Public Records Act to broaden access to public records." (*Galbiso, supra*, 167 Cal.App.4th 1063, 1088; *Filarsky, supra*, 28 Cal.4th at p. 427.) "Indeed, the very purpose of the attorney fees provision is to provide 'protections and incentives for members of the public to seek judicial enforcement of their right to inspect public records subject to disclosure.' " (*Galbiso, supra,* at p. 1088.)

In light of these statutory policies, we conclude that CYAC may qualify as a "prevailing" party, since CYAC sought and obtained declaratory relief that there had been PRA violations, and we have found the record supports that conclusion by the trial court. It would not be a practical or reasonable interpretation of Government Code section 6259, subdivision (d), to say that a public agency is protected from liability for an attorney fee award, because it cannot or will not produce the documents due to its internal logistical problems or general neglect of duties. However, we do not decide the entitlement issues on this record, but remand for the trial court to determine all the fee issues, upon remand. Along with the Code of Civil Procedure section 1021.5 fee issues, next to be discussed, the CYAC fee motion must be returned to the trial court to determine any reasonable

attorney fees or apportionment regarding the PRA claim (only one of CYAC's seven

causes of action).[29]

C. Code of Civil Procedure section 1021.5; Remand for Discretion of Trial Court

The principles for considering an award of fees under Code of Civil Procedure

section 1021.5 are now well settled. The statute seeks to address the problem of

"inherent unaffordability of legal services for public interest cases yielding primarily

nonpecuniary benefits." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1225

(*Whitley*).) Eligibility for such attorney fees awards is established when " '(1) plaintiffs'

action "has resulted in the enforcement of an important right affecting the public

interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been

conferred on the general public or a large class of persons" and (3) "the necessity and

financial burden of private enforcement are such as to make the award appropriate." ' "

(*Id.* at p. 1214.) Each requirement must be met, and the trial court's award is evaluated de

novo for its consistency with these applicable legal principles, on the available record.

(*Id.* at p. 1213; *In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1052.)

In *Whitley*, *supra*, 50 Cal.4th 1206, 1221, the Supreme Court made it clear that for

purposes of applying these requirements, the court should assess the criterion of the

---

[29]    Although we have found CYAC may qualify as a prevailing party on the PRA
claims, we feel compelled to observe that CYAC only prevailed with regard to two
classes of documents. The record clearly shows that CYAC received a very large number
of documents from the City without the necessity of declaratory relief. Thus, on remand,
the court in determining reasonable attorney fees should focus on the amount of effort
reasonably related to the limited scope of the PRA declaratory relief that was granted,
and the relationship of the relief to the CRL orders. (See *Bell, supra,* 82 Cal.App.4th at
pp. 689-690.)

86

financial burden of litigation not with attention to the subjective motives of the litigant, but must consider the "objective financial incentives" for litigation, in deciding the third element for eligibility for fees, whether " 'the necessity and financial burden of private enforcement are such as to make the award appropriate.' " (*Id.* at p. 1214.) Even if that element is met, the trial court must also decide the remaining issues about any resulting enforcement of an important right affecting the public interest, or any significant benefit conferred in that respect. (*Ibid.*) If those tests are met, the trial court "may legitimately restrict the award to only that portion of the attorneys' efforts that furthered the litigation of issues of public importance." (*Whitley, supra,* 50 Cal.4th at p. 1226.)[30]

In this case, we cannot determine what proportion of the existing attorney fee awards were attributable to the federal due process theories. As CYAC already recognized, by deleting its fee requests regarding its unsuccessful state constitutional claims, no award on them would be proper. Although all the basic issues were closely intertwined at trial, the specific statutory claims under the CRL (and as to CYAC, the limited PRA issues) were dispositive. The trial court's substantive ruling on the procedural due process claims went too far, and accordingly, neither of its attorney fee awards was fully supported by the applicable legal principles. On remand, "further

---

[30]    The City's judicial notice request, as granted, included two sets of 2012 bill history and veto messages for two pieces of legislation that the Governor vetoed, that would have restored some of the redevelopment powers that were taken away from municipalities in 2011. The City argues this material shows there was no significant public interest in the subject matter of this lawsuit and no support for any awards of private attorney general fees. (Code Civ. Proc., § 1021.5.) We need not decide that issue and return the entire set of attorney fee entitlement issues to the trial court.

87

consideration and amplification of reasoning" will be required to determine the extent to which fees awards are proper regarding the remaining statutory theories, the CRL as to both prevailing parties, and the PRA as to CYAC only. (See *In re Vitamin Cases, supra,* 110 Cal.App.4th 1041, 1052.)

DISPOSITION

The judgment is affirmed in part with respect to the declaratory relief issued on the CRL and PRA issues; the declaratory relief granted on the claim of federal procedural due process violations is reversed, with directions to enter a different order denying that claim, and to conduct further proceedings in accordance with the views expressed in this opinion on the attorney fee issues.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.